Joan Caldwell JOHNSON, Bryce Anderson, Lorraine Witherspoon Baker, William Bell, Faye Blaylock, Sara Edell Boan, Mike Brewer, Mike Brown, Ronald Callahan, Sandra Coulter, Lisa Crum, Andreas Drutis, Darryl Bernard Epps, Buster Elfin Floyd, Deanna Kay Frans, William Joseph Harnett, Jr., George Henley, Loretta Jones, Margaret Locklear, Tammy Locklear, Linda McCleod, William McCormick, Hugh Meise, Patty Miller, Andrew Nobles, Gary Padgett, Mary Pinchback, Vardry Pittman, Albert J. Samra, Mason Skeenes, Danny Kay Smith, Amber Strickland, Charles Stubbs, Lonya Thigpen, James Thompson, Joseph Chester Walker, Jessie Williams, Valerie Williams, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

COLLINS ENTERTAINMENT COMPANY, INC., Ace Amusement, LLC, American Amusement Company, Inc., American Amusement of Aiken, Inc., B & J Amusement, Best Amusement Co., Broyles & Lutz, Inc., CBA Games, Inc., Carousel Amusements, Coley, Inc., Drew Industries, Fast Freddies, Great Games, Inc., Greenwood Music Co., Inc., H & J of South Carolina, Inc., Holliday Amusement Company of Charleston, Inc., Hoyts Music Co., Inc., Huckleberry Amusement, Inc., Ingram Investments, J.M. Brown Amusement Co., Inc., Joytime Distributors & Amusement, MHJ Corporation, MHS Enterprises, Inc., Martin Coin Machine, Inc., McDonald Amusement Co., Midlands Gaming Corp., Pedroland, Inc., R.L. Jordan Oil Co. of North Carolina, Red Dot Amusements, Rosemary Coin Machines of Florence, Inc., Scott's Vending Inc. of Columbia, Sumter Petroleum Co., Tim's Amusement, Inc., Video–Matic Amusements, Inc., H. Hugh Andrews, II, Pamela A.

Andrews, Dwayne I. Bohannon, J.M. Brown, Don E. Broyles, Grace E. Coley, Fred Collins, J. Samuel Cox, Kenneth G. Flowe, Carey Hardee, Scott G. Hogue, Lowell E. Holden, Patricia Holliday, Warren P. Holliday, Henry E. Ingram, Steven E. Lipscomb, Tim Mahon, Jimmy Martin, Jr., Cynthia McDonald, James McDonald, Allan Schaefer, David R. Simpson, Ron Simpson, Mickey H. Stacks, William Darwin Wheeler, Hershel L. Williamson, in their individual and corporate capacities as representatives of all others similarly situated, Defendants.

No. 3:97–2136–17.

United States District Court, D. South Carolina, Columbia Division.

April 28, 1999.

## MEMORANDUM OPINION ON PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

ANDERSON District Judge.

### Introduction

Late in the 1986 legislative session, a state senator successfully added a proviso to the 1986–87 South Carolina General Appropriations bill which carved out an exception to the state's 274 year old laws prohibiting gambling.[1] This little-noticed, highly-technical, and slightly-ambiguous amendment to the anti-gambling statute provides that "coin-operated nonpayout [machines] with free play feature" are exempt from a state law which otherwise prohibits "any vending or slot machine . . . or other device pertaining to games of chance."[2]

The South Carolina Supreme Court subsequently held that this proviso legitimized the payment of money to players of video gaming machines, as long as the money was dispensed by a person and not the machine.[3] Since that ruling, South Carolina's video poker industry has grown exponentially. According to the most recent figures released by the South Carolina Department of Revenue, there are currently over thirty-four thousand video poker machines in South Carolina.[4] The money wagered on these machines in calendar year 1998 totaled more than two and one-half billion dollars.[5] In 1998, on average, each machine took in over eighty-seven thousand dollars in wagers. Furthermore, this translates into over six hundred sixty dollars being wagered on video poker by every man, woman, and child in South Carolina.[6]

In response to this explosive growth, the South Carolina General Assembly has made periodic attempts to regulate the industry, enacting laws designed to be a moderating influence on both the availability and attractiveness of the machines. For example, there is a restriction of five machines per single place or premises.[7] The video poker industry has been successful in court challenges to some of these laws.[8] It is one of these laws, limiting cash payouts to $125 per player per location, that is now before this court for interpretation and enforcement.

---

1. Legislation designed to control "the mischiefs of gambling" was enacted by the South Carolina colonial legislature in 1712. *See generally* G. Robert Blakey, *Gaming, Lotteries, and Wagering: The Pre–Revolutionary Roots of the Law of Gambling*, 16 Rutgers L.J. 211, 262–65 (1985) (citing Act of Dec. 12, 1712, *reprinted* in J. GRIMKE, THE PUBLIC LAWS OF THE STATE OF SOUTH CAROLINA 100 (Phila.1790)).

2. The proviso is now codified at S.C.Code Ann. § 12–21–2710 (Supp.1998).

3. *State v. Blackmon*, 304 S.C. 270, 403 S.E.2d 660 (1991).

4. South Carolina Department of Revenue, *Video Game Machine License Sales*, June 1998 to February 1999 (listing 34,292 machines).

5. South Carolina Department of Revenue, *South Carolina Video Game Machine Quarterly Reports*, 4th Quarter 1998 (April 1999) (listing gross receipts of $2,536,900,763; average receipts of $87,206; and average gross profits of $24,969 on 29,091 machines).

6. According to the U.S. Census Bureau, there are currently 3,835,962 residents in South Carolina. U.S. Bureau of the Census, Population Division, *Population Estimates Program*, March 1999. The per-person wagering amount would be significantly higher if one were to eliminate South Carolina residents under the age of twenty-one, who are prohibited by law from receiving cash payouts. S.C.Code Ann. § 12–21–2804(C).

7. S.C.Code Ann § 12–21–2804(A) (Supp. 1998).

8. *See, e.g., Reyelt et al. v. South Carolina Tax Commission*, C/A No. 6:93–1491–3 and 6:93–1493–3 (D.S.C.1995) (striking down, as void for vagueness, a requirement that locations that have video poker machines derive "a substantial portion" of their gross proceeds from non-video poker sources); *Martin v. Condon*, 324 S.C. 183, 478 S.E.2d 272 (1996) (invalidating a law that allowed county-by-county referenda on allowing video poker to be offered, thus overturning elections in twelve counties that voted to ban the machines).

## Procedural History of Case

Plaintiffs, purporting to represent themselves and others similarly situated, initiated this action in state court in June 1997 seeking actual and punitive damages, as well as injunctive relief. Plaintiffs claim to be addicted gamblers. They assert a variety of claims against the defendants in this case, who comprise a substantial segment of the video poker industry in South Carolina. Plaintiffs contend, among other things, that defendants have violated various state laws and regulations, that these violations induced plaintiffs to gamble excessively, and that as a result, plaintiffs have sustained devastating economic losses of varying degrees, including personal bankruptcy, loss of homes, life savings, college savings, and the like. Plaintiffs also claim a variety of less tangible but nonetheless substantial consequential injuries, including emotional devastation and destroyed marriages. Because one of the plaintiffs' claims is under federal law—the Racketeer Influenced and Corrupt Organizations Act (RICO)—defendants removed the action to federal court, thus presenting this court with a hotly-contested controversy involving not only a federal racketeering claim, but also several thorny state law issues.[9]

In mid–1998, plaintiffs moved for a preliminary injunction on the $125 payout limit. At a status conference held to discuss this and other issues, this court raised the question of whether the plaintiffs would be able to post an adequate bond to secure a preliminary injunction, as required by Fed. R.Civ.P. 65(c). The question of an adequate bond became more acute when the South Carolina Attorney General, who had been allowed to intervene in the action to join all of plaintiffs' contentions, decided to withdraw except as to the lottery issue. He expressly withdrew from any attempt to seek interpretation or enforcement of the $125 payout limit, indicating to the court that it is his office's traditional practice to defer to the South Carolina Department of Revenue on such issues. Had the Attorney General remained aligned with the plaintiffs on this issue, the bond issue would have been a lesser factor because, in some circumstances, the state is not required to post a bond.

In light of these developments, plaintiffs decided not to pursue their request for a preliminary injunction, opting instead to conduct discovery on the $125 payout issue and then move for partial summary judgment and a permanent injunction[10] enforcing the payout limit against eight defendants: Collins Entertainment Corporation, Inc., Fred Collins, Jr., R.L. Jordan Oil Co., MHS Enterprises, Inc., Mickey Stacks, Pedroland, Inc., Ingram Investments, Inc. and Henry E. Ingram.

Plaintiffs filed the present motion in late February, 1999. This court thereafter accorded the defendants two extensions of time within which to respond. After all briefs had been filed, the matter came before the court for oral argument on April 19, 1999.[11] Although the motion is directed at only eight of the named defendants, the court permitted briefing and

---

**9.** Among the state law issues raised by the plaintiffs was a claim that video poker machines violated South Carolina's constitutional ban on lotteries. This court certified the lottery question to the South Carolina Supreme Court, which held, on a 3–2 vote, that video poker does not constitute a lottery. *Johnson v. Collins*, 333 S.C. 96, 508 S.E.2d 575 (1998).

**10.** Along with their motion for a permanent injunction to enforce the state law cap on payouts, plaintiffs have moved for summary judgment on their RICO claim, and their unjust enrichment claim. Those aspects of

plaintiffs' motion, and defendants' related counter motion, will be addressed in a separate order.

**11.** By oral ruling which is confirmed by a separate order, this court denied a motion to stay which was based on procedural arguments. This motion was filed by a group of defendants who are not subject to the present motion for summary judgment. The motion to stay was filed on the Thursday before the scheduled hearing, well after the same defendants had responded to the motion on its merits. *See* Order No. 67.

argument by all of the defendants in the case because of the potential consequences to them of an adverse ruling. After hearing nearly eight hours of oral argument on April 19, the court took the matter under advisement and indicated that it would announce its ruling on the injunction request the following day. On April 20, the court orally granted plaintiffs' motion for a permanent injunction and indicated that a written order would follow. The effective date of the ruling was stayed until ten days after the filing of a written order. This order memorializes the court's oral ruling of April 20, 1999.

### Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir.1987).

The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir.1985). Therefore, "[m]ere unsupported speculation ... is not enough to defeat a summary judgment motion." *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir.1995).

Summary judgment is particularly appropriate where claims rest on issues of legal interpretation and application of appropriate legal standards. *See generally,* Schwarzer, Hirsch & Barrans, The Analysis and Decision of Summary Judgment Motions, 139 F.R.D. 441, 456–57 (1992). Summary judgment motions may address fewer than all claims and may resolve only specified issues without resolving any claims in full. Fed.R.Civ.P. 54(b) & 56(d).

### Facts

Viewed in the light most favorable to the defendants, there is clear and unequivocal evidence in the record demonstrating a widespread and systematic pattern by these defendants,[12] of offering and paying out cash prizes in excess of $125 to individuals who play machines licensed under South Carolina's Video Game Machines Act ("VGMA"), S.C.Code Ann. § 12–21–2770 *et seq.* (Supp.1998).

All of the machines [13] owned or operated

---

**12.** As used herein, "these defendants" refers to the eight defendants who are the subject of the present motion. Defendants Collins Entertainment Corporation, Inc. and Fred Collins, Jr. will be referred to collectively as "Collins." Defendants Ingram Investment, Inc. and Henry E. Ingram will be referred to collectively as "Ingram." Defendants MHS Enterprises, Inc. and Mickey Stacks will be referred to collectively as "MHS." Some of the defendants act solely or partially as lessors of machines. For reasons discussed herein, the lessor defendants may be held to have acted through others in making the payments at issue.

**13.** The video poker machines at issue are all microprocessor-based devices with random number generators. The microprocessors allow the game to function by establishing the parameters of the game and the links between the various input and output devices. The random number generators simulate activities such as the dealing of cards or the selection of a random number.

Play requires the payment of money directly into the machines. Play of the machines may result in the accumulation of credits. Credits can be used to play additional games. The player can receive cash at the conclusion of play for accumulated credits, although some operators will not make a cash payout if credits are below a minimum number. The machines themselves do not pay out any cash.

Each of the machines has specific pay tables for specific games. These tables advise

by these defendants display progressive jackpots that routinely or always exceed $125 by a significant amount. Some jackpots may reach over $10,000. The jackpot displays are very prominent on the machines. They are generally lighted and highly visible. All of the machines also have "pay tables," which provide for minimum payoffs in excess of $125 for a single hand.

The defendants subject to this motion fall into two categories: those who lease machines to others and those who operate machines themselves. The record demonstrates that each of the defendants who operates retail establishments where machines are located and available for play routinely makes payouts to a single player for play at a single location in a single day for amounts in excess of $125. Although the actual payout is accomplished in a variety of ways, it is facilitated in each case by the machine printing out a series of tickets for payouts of $125 each. These tickets are then redeemed by taking them to an employee who may require the player to sign a document indicating that any amount received in excess of $125: (a) is not more than $125 over the amount of money deposited into the machine; or (b) will be held in trust by the player and paid out to himself over a series of days (at $125 per day); or (c) some combination or variation of the two disclosures.[14]

One of the defendants, MHS, while professing an interpretation of the statute to allow for payment of losses plus $125, nonetheless concedes no instructions whatsoever are given to the location employees to tell them what to pay out or what limits to apply. The attendants simply pay the amounts shown on the tickets. Depos. of Stacks, owner of MHS at 25. This defendant does not require the player to sign any form of a release.

Another defendant R.L. Jordan, while acknowledging initially understanding the statute as prohibiting payouts in excess of $125 regardless of the amount wagered, nonetheless concedes his business changed its practice of complying with the law because it was losing money to competitors. These competitors were not only far more profitable in their video gaming business but were able to underwrite the expenses of their related businesses (*e.g.*, gas prices) because of that profitability, thus threatening R.L. Jordan's entire business. This defendant now has the players sign a "release" that attempts to cover all possible interpretations of the statute (other than the one applied by this court and the relevant regulatory body). Players who refuse to sign the release may only be allowed to collect $125.00.

Defendant Ingram advances an interpretation that the players can receive up to $125 more than their losses and, therefore, requires that the player sign each ticket to indicate that the payment is in compliance with this interpretation. Its officer, however, concedes that this statement is blindly accepted regardless of the probability of its truthfulness. Notably, the form used is internally inconsistent (stating first that no more than $125 was received, then referring to amounts over $125 which were received) and relies on a statutory section (S.C. Code Ann. § 32–1–20) not directly relevant to the payout limitations. "Signatures" provided are, moreover, frequently inadequate at best.

Pedroland initially claimed to interpret the law as allowing payment of "losses plus" $125, despite knowledge of contrary

---

players of the number of credits (or dollars) that they will receive for a given result, for instance, for a royal flush in a game of poker. The games may also display jackpots, which may be paid for specific events. The jackpot and many of the pay tables include amounts well in excess of $125. *See* fact findings contained in Order of Certification to South Carolina Supreme Court (February 24, 1998).

14. Some of the forms utilized are internally inconsistent, illogical or both. Many have only a first name or initials where a signature is required. It appears that many different names may well be "signed" by the same person. *See* Attachment A hereto (describing the activities of each of the defendants in detail and attaching relevant sample documents).

judicial rulings and DOR interpretations, but in practice allows its employees to redeem tickets without limitation (except to attempt to keep payouts under $1000). Employees also pay out winnings to proxies or make multiple payments over a series of days for credits earned in a single day by a single player. Pressed during his deposition, Pedroland's officer indicated multiple inconsistent interpretations of the law to legitimize each of these practices.

Some of the defendants (Collins, R.L. Jordan and Ingram) also lease machines to locations owned and operated by third parties. The lease is paid in whole or in part by sharing of the machine profits. These "lessor" defendants are solely responsible for the machine programming and maintenance. That is, the location cannot modify the jackpot display or print out of tickets or any other operational feature of the machine. Nonetheless, the actual day-to-day operations and all payouts are handled solely by the location operator.

The Collins defendants operate solely in this manner and have never actually made any form of a cash payout. Indeed, Fred Collins, owner and CEO of Collins Entertainment, indicates an understanding of the law as prohibiting any payout in excess of $125 and claims to require that each of his lessees abide by that and all other relevant laws.

Record evidence as to lessee locations for each of these defendants demonstrates unequivocally that payouts in excess of $125 are being routinely made. Because these defendants split profits with these locations, and because those profits must be determined by deducting the amount of payouts from the amount of money placed into the machines, it is axiomatic that these defendants necessarily know the amounts of the payouts.

It is also beyond dispute that all of the defendants derive a profit from the businesses which are operated in this manner. Most of the defendants concede that the offering of payouts in excess of $125 increases their profits.[15]

In short, the record clearly discloses that all defendants are either directly making payments in excess of $125 per player per location per day, or are acting in direct concert with others who do and with knowledge of the activities at issue.[16] All defendants are profiting from this behavior. Those defendants who do not directly make the payouts also enable the violation of the law through the programming of the machines which display large jackpots and print out series of tickets for $125 each.

All defendants concede they are and have been aware of this court's prior preliminary ruling regarding the interpretation of the relevant law (S.C.Code Ann. § 12–21–2791) as limiting cash payouts to $125 regardless of the amount wagered. This interpretation is consistent with the longstanding interpretation of the South Carolina Department of Revenue ("DOR")[17] and two state Administrative Law Judge rulings. Defendants are actually aware or are chargeable with knowledge of each of these interpretations. Despite this knowledge, none of these defendants indicated any intent to modify its behavior which is ongoing and of long-

---

**15.** As Ingram admits, success in the video gambling business is directly linked to large payouts. So close is this connection that if ordered to limit payouts to no more than $125, Ingram would choose to get out of video gambling because:

I mean they [customers] wouldn't hardly play them. They'd put in $1,000. They couldn't get but $125 back. Although we are uneducated in South Carolina, we aren't that uneducated.

Ingram depos. p. 140, lines 5–8.

**16.** In responding to the motion for summary judgment, defendants challenged few if any of plaintiffs' factual assertions as to defendants' behavior. Rather, they challenged the legal conclusions, jurisdiction, available grounds for equitable relief and the standing of the particular plaintiffs to challenge these defendants' behavior.

**17.** While there is significant evidence that relatively few sanctions have been issued for violation of the statutory cap, all evidence shows a consistent interpretation by DOR.

standing duration. Most simply indicated they "disagreed" with the ruling. The Collins defendants indicated an intent to comply with the ruling, but this intent is irrefutably challenged by evidence of Collins' actual practices.[18] Another defendant, R.L. Jordan, conceded understanding the law as this court interprets it, but admitted bowing to competitive pressure to violate the law.

Despite the unchallenged evidence presented by plaintiffs of defendants' widespread practices of paying out in excess of $125, there is little evidence of any enforcement activity by the relevant enforcement agencies, at least until recently. The only indication is of approximately fifty citations for excess payouts being issued to the entire industry since 1993.[19] The defendants to this motion were personally aware of only a very few citations. This is an incredibly small number given the number of machines in operation, the apparent frequency with which illegal payouts are made, and DOR's consistent interpretation of the statute. This may be in part due to the method of enforcement which seems to be primarily through undercover agents playing the machines, rather than through audits on the available records or the requirement for the keeping of other records. In any case, while there was some suggestion made of possible increased efforts at enforcement in recent months, the evidence is clear that defendants see little or no reason to change their behavior which, for reasons discussed below, is in clear violation of the law as pronounced by this court, DOR, the Administrative Law Judges who have addressed the issue, and a longstanding South Carolina Attorney General's opinion.

**18.** During his deposition, defendant Fred Collins was confronted with a series of payout slips that clearly demonstrate that payments in excess of $125 are being made on machines leased by Collins to a location. Rather than demonstrating any shock or dismay at the revelation, Collins simply countered the line of inquiry with the repeated retort: "so

## DISCUSSION

### I. Interpretation of statutory cap on payouts.

#### A. This court interprets S.C.Code § 12–21–2791 to limit the total amount of cash that can be paid out for credits remaining on a machine at the close of play.

This court finds South Carolina Code § 12–21–2791, which places limits on the amount of cash payouts as a result of play of video poker machines, is intended to set a maximum cash payout regardless of the amount of money placed into the machine. In this regard, the court adopts its preliminary ruling in Order No. 42 as a final ruling. *See* Order No. 42 at 26–31 (filed September 15, 1998). The relevant text of this order is repeated below.

##### 1. Relevant discussion from Order No. 42.

The relevant statute reads as follows:

Any location which operates or allows the operation of coin-operated machines pursuant to Section 12–21÷2720(A)(3) which provides payouts shall limit the cash payout for credits earned for free games to two thousand five hundred credits a player a location during any twenty-four hour period. The cash value of credits for each free game is limited to five cents.

S.C.Code Ann. § 12–21–2791 (Supp.1998).

There is no dispute that the calculation required by this statute results in a dollar cap of $125. The dispute relates to how, if ever, an amount exceeding $125 can be paid out. In short, the parties differ on the meaning of the phrase: "payout for credits earned for free games ... during any twenty-four hour period." Plaintiffs

what's the question?" Collins at 128–133. This is hardly consistent with any claim of good faith attempt to comply with the law.

**19.** This "indication" was in the form of a statement by plaintiffs' counsel which was not contested by defendants.

suggest the phrase means that no payment in excess of this amount can be made or offered based on the credits accumulated during any 24 hour period, regardless of how the payouts are actually made. Defendants vary in their interpretations, but appear to offer two primary arguments for how more than $125 can be paid: (1) the limit applies to what payouts can be made during a 24 hour period; thus, successive payments over a period of days can be made for credits earned during a given day; or (2) credits earned refers to credits in excess of the credits received for money paid in, allowing players to recover what they have put in the machines plus $125.[20]

Before analyzing these positions, it is important to understand what plaintiffs are and are not claiming. Defendants suggest that plaintiffs cannot have any injury even if they are right as to any improper payment in excess of $125 because plaintiffs would have lost nothing by receiving an excess payment. Quite the contrary, as the court understands plaintiffs' position, it is that they were improperly *induced* into placing excessive amounts of money into the machines by the prospect of winning large jackpots, which are, in fact, prohibited by law, and that they lost excessive sums due to this inducement.[21]

In construing a statute, the court must give language its plain and ordinary meaning without resort to subtle or forced construction. *First Baptist Church of Mauldin v. City of Mauldin*, 308 S.C. 226, 417 S.E.2d 592 (1992). Only when literal application of a statute produces an absurd result will the court consider a different meaning. *Southeastern–Kusan, Inc. v. South Carolina Tax Comm.*, 276 S.C. 487, 280 S.E.2d 57 (1981). The court will reject an interpretation of a statute which leads to absurd result that could not have been intended. The court must also presume [that the Legislature] did not intend the statute to be futile. *State ex rel McLeod v. Montgomery*, 244 S.C. 308, 136 S.E.2d 778 (1964). *See also Windham v. Pace*, 192 S.C. 271, 6 S.E.2d 270 (1939)(language of statute must be read in sense which harmonizes with its subject matter and accords with its general purpose and object).

Looking to the general framework of this state's laws on gambling, it is obvious that the Legislature has sought to limit the negative effects of gambling. Thus, there has long been a statute allowing for recovery of losses in excess of fifty dollars, whether to legal or illegal gambling. S.C.Code Ann. § 32–1–10 & 20. Similarly when the Legislature decided to allow cash payouts from video poker machines, it passed extensive legislation containing numerous limits. *See* S.C.Code Ann. § 12–21–2770 *et seq.* The statutory cap on cash payouts, in particular, is clearly intended to discourage gambling by limiting winnings.

The only reasonable way to read the statute to comport with its plain language and legislative intent is to limit cash payouts, regardless of when or how the payout is made, to the stated amount ($125) for any credits earned at that establishment in

---

**20.** In addition to the reading that the plaintiffs suggest, and the two alternative ways suggested by some defendants as to how more than $125 can legally be paid out, at least one defendant offers a fourth explanation of how machines might legally display jackpots in excess of $125. That is, that the player can "win" but cannot cash out over $125 total. He argues, in essence, that the player plays for the thrill of "winning" the jackpot, but, presumably, knows he will not be allowed to cash out more than $125.

**21.** Notably, defendants argue both that plaintiffs are prohibited from any recovery because they are *in pari delicto* (particularly as to any lottery-based claim) and that plaintiffs cannot pursue other equitable relief. However, if defendants are correct as to the *in pari delicto* defense, it would seem axiomatic that plaintiffs, as potential wrongdoers, could themselves seek a declaratory judgment as to whether they might violate the law if they accepted a payout in excess of $125 or some other benefit that might arguably constitute an "inducement." *See* 28 U.S.C. § 2201 (creating declaratory judgment remedy); 10B Charles A. Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure, § 2751 (West 1998).

a 24 hour period. "Credits earned," in turn, meaning the credits the player has at the conclusion of play regardless of whether they are due to money the player put in or credits later won which, in current practice are apparently shown on a print out given by the machine at the conclusion of play.

Returning to defendants' proffered constructions of the statute, the court easily rejects the position that the statute allows for successive payments of $125 per day on credits earned in a given day. The statute limits the "payout for credits earned for free games [to $125] a player a location during any twenty-four hour period." Making a series of successive payments, which total more than $125, would render the limitation nearly meaningless since there would be no monetary cap, only a logistical inconvenience for the player.[22] In short, this interpretation must be rejected because it avoids any effective limit.

The court also rejects the interpretation that would allow payouts of any amount so long as it was no more than $125 over the amount placed into the machine. Defendants' own suggestion as to how they determine the amount of the losses demonstrates why this interpretation would be wholly unenforceable. The defendants who rely on this interpretation argue that they require players to sign a statement that the amount received is not more than $125 over the amount placed into the machine during the same twenty-four hour period. Defendants argue that they may blindly rely on these statements, regardless of how long the player has been playing or the amount of the winnings. Such a practice encourages dishonesty and, effectively, renders the limitation unenforceable, if not meaningless. Moreover, it might well demonstrate an intent to shift responsibility for knowingly unlawful behavior from the ones most responsible for compliance, to those least responsible for compliance.

To construe the statute in this manner would lead to ludicrous results and render the limitation unenforceable. This court cannot, therefore, conclude that the Legislature intended this result which, in any case, requires a relatively tortured construction of the plain language.[23]

\* \* \* \* \* \*

This court's plain reading of Section 12–21–2791 suggests that payout for "credits earned" refers to the credits remaining at the time the player decides to cash out, at which time, under current practice, the machines generally print a slip showing credits remaining (be they from money paid in or credits "won"). While some other reading might be possible, it would, as noted above, lead to a complexity of calculation and enforcement that would likely render the provision unenforceable. Thus, the court concludes that if the Legislature had intended any other meaning, it would have stated it more explicitly. Indeed, if this was the intent, the Legislature would likely have added a requirement for some form of monitoring, player by player, which would have facilitated enforcement of a $125–plus–losses payout mechanism when it established a statewide computer monitoring program for video poker machines. *See generally* S.C.Code Ann. § 12–21–2776(B)(11). It did not.

The ease with which the Legislature could have achieved the result defendants advance is demonstrated by the language of a vetoed portion of the 1996–97 South Carolina state budget bill:

 I. Section 12–21–2791 of the 1976 Code, as added by Act 164 of 1993, is amended to read:

 Section 12–21–2791. During a twenty-four hour period, a person is not permitted to win more than one hun-

---

**22.** The requirement to return for successive cash payments might itself constitute or lead to alleged special inducements if the player is encouraged to play when he or she returns.

**23.** *State ex rel McLeod v. Montgomery,* 244 S.C. 308, 136 S.E.2d 778 (1964) (court will reject interpretation of statute which leads to absurd result that could not have been intended—court must also presume legislature did not intend statute to be futile).

dred twenty-five dollars over and above the amount deposited in a coin-operated machine authorized under Section 12–21–2720(A)(3).

1996–97 Budget Bill, Part II § 54I. The clarity of meaning of this provision counsels against torturing the language of the existing statute to achieve the same result.[24]

## 2. Additional authority not discussed in Order No. 42.

Subsequent to this court's preliminary decision in Order No. 42, then Administrative Law Judge Allison Lee issued a decision on the same issue in *South Carolina Department of Revenue v. McDonald Amusements, Inc.*, 98–ALJ–17–0123–CC. Judge Lee reached the same conclusion as this court in Order No. 42, relying in part on this court's analysis. Judge Lee concluded, inter alia, that "DOR has interpreted Section 12–21–2791 to prohibit payouts in excess of $125 to any person in a twenty-four hour period, regardless of how much cash the person initially deposited into the machine, consistently since its enactment in 1993." *McDonald Amusements* Final Order and Decision at ¶ 12 (Findings of Fact).[25]

Indeed, the only actual evidence presented to this court of DOR's position as to interpretation is that it has consistently been as Judge Lee and this court interpret the statute. For example, this interpretation is stated in the initial guidebook produced by DOR in 1993 which is given to operators. *A Guide to Conducting Video Gaming Establishments in South Carolina* at 6 (hereafter *"DOR Guide"*) ("In determining the cash payout, it is irrelevant as to the amount of credits originally purchased by the player and as to the amount the player originally paid for each credit. . . . The player may not receive a cash payout for those credits in excess of [credits equaling $125]. . . . All cash payouts must be made immediately after the player completes play and the location owner or employee clears the remaining credits off the machine.").[26] DOR has apparently relied on the *DOR Guide* in ALJ hearings to demonstrate what the operators are told and the consistency of DOR's position. In addition, the DOR recently filed a brief in another federal district court case stating that this has been DOR's longstanding interpretation.[27] This is consistent with this court's review of recent and older DOR documents expressing DOR's interpretation of the statute. *See, e.g.*, S.C. Information Letter 94–28 (stating that the department requested and received an opinion from the Attorney General which confirmed the department's interpretation of Section 2791 as limiting

24. The language in this section is taken verbatim from Order No. 42 at 26–30.

25. This court understands the *McDonald* decision to be on appeal to the State Circuit Court which provides the first level of appeal for ALJ decisions.

26. The deposition of a DOR employee indicates that this document was created soon after the passage of the Video Game Machines Act which became effective on July 1, 1993. It was given to operators at least for a period of time and is still available from the department. While not having the same status as a regulation or revenue ruling, it has been relied on by the department in various hearings. Although various sections of it have become invalid or may be modified due to later contrary judicial rulings or regulations, there is no evidence that the document itself has been withdrawn or otherwise repudiated by the department, particularly as it relates to the interpretation of Section 2791.

27. This brief was filed in response to an attempt by a group of video poker operators, one of whom is involved in the present action, to reopen a case before District Judge G. Ross Anderson. That case, *Reyelt*, was closed in 1993 after Judge G. Ross Anderson determined that the relevant statute satisfied constitutional standards except as to one section not relevant here (discussed *supra* at n. 8). Some defendants in this case have suggested that they relied on a comment in dicta by Judge G. Ross Anderson in that case suggesting that, if the issue were presented to him, he might find that the Section 2791 did authorize payouts of "losses plus $125." Nonetheless, it is clear that the issue was not raised, briefed, or argued to Judge G. Ross Anderson in *Reyelt*.

the maximum payout to $125 and "that the maximum payout is not affected by the amount of money deposited in the machine. In other words, the cash payout is based on the total number of credits remaining on the machine when the player finishes playing.").

Notably, even the one state court case on which defendants rely to support dismissal of the RICO and SCUTPA claims indicates that judge's understanding that the $125 payout cap is absolute and not dependent on the amount of money placed into the machine:

> Section 12–21–2791 limits the amount of cash payouts for free games earned to $125 in any twenty-four hour period. There is no limit on the amount of free game credits a player may earn during any twenty-four hour period. Section 12–21–2791 *merely prohibits operators from providing more than $125 in cash redemption* for these free game credits.

*Gentry v. Yonce*, 97–CP–41–165 (11th Judicial Circuit, 1998) (emphasis added).

### B. Defendants alternative arguments for interpretation must be rejected.[28]

Some defendants have argued that the statute must be interpreted to be "losses plus" to effectuate the phrase "credits *earned.*" These defendants rely on an illustrative situation in which a player deposits $200 and then immediately decides to cease play and seek a refund. Relying on this unlikely scenario, defendants suggest that to interpret the law as this court does would preclude a refund and is, therefore, invalid. This court rejects this argument.[29]

Initially, the scenario is unpersuasive because it is highly unlikely (particularly if

a player is aware from the outset that he can never receive a cash payment in excess of $125). It is certainly not demonstrative of the likely pattern of play with much smaller denominations being placed into the machines over a period of time. Thus, it is a poor example to demonstrate the point.

In any case, the underlying assumption is contrary to another basic premise advanced by defendants: that the players deposit money into the machines for the opportunity to play the games on the machine and to be entertained. Thus, the players have received what they paid for when they are given the opportunity to play. As defendants argue this point, the possibility of winning is a mere expectancy interest.

This analogy and a related "investment" analogy are also unpersuasive because they assume that a person putting money into a video poker machine reasonably expects a return of the money placed into the machine, possibly plus some interest or other return. The testimony offered in prior hearings is clearly to the contrary. Over time, even "perfect" players can expect to receive back something less than all of the money they deposit into a machine.

The motivation for playing may vary from entertainment only, to the chance to win only, to some combination. It is clear, however, that players do not reasonably deposit their money as an "investment," expecting under normal circumstances to recoup their deposit plus some degree of "earnings."

In summary, defendants "refund" and "investment" analogies must be rejected.[30]

---

28. This section will address only new arguments raised in regard to the April 19, 1999 hearing. Other arguments are discussed in the adopted portion of Order No. 42 included in section I.A.1. above.

29. This court is not deciding whether a refund could be made to a player who deposited money into a machine and immediately had a change of heart after depositing the money

but before commencing play. Such a situation would, however, be highly unlikely and any refund procedures would need to be carefully controlled to prevent the risk of using claimed "refunds" as a means of evasion of the statutory cap.

30. Even if the court could adopt this "refund" theory, the proper calculation would not result in a "losses plus" interpretation of the

Players deposit money for the right to play hands or games and the possibility of some return or even gain. Assuming honest advertising and operation of the machines, players receive that paid-for benefit at the end of a hand whether they have won any money or not. The statute's reference to credits "earned" simply refers to those credits remaining at the termination of play.

Although defendants offered a variety of other interpretations of the statute which might allow payment of more than $125, no real arguments were offered to support any other interpretations. Most notably, no legal argument was made to support an interpretation to allow the daily payment of $125 until a larger jackpot was paid out in full.[31] Similarly, counsel for the defendant who utilizes the "release" which incorporates both arguments and throws in a trust-in-favor-of-self provision made no effort to argue that the "release" was based on any reasoned understanding or interpretation of the law. *See* Attachment A (discussing defendant R.L. Jordan).

Although no party has actually argued for such an interpretation, it appears from the record that some defendants in this action allow payout tickets to be cashed in by proxies for the individual player. No argument in favor of this interpretation was offered by any defendant.

For the reasons discussed above, this court rejects the "losses plus" interpretation of Section 2791. It also rejects any interpretation which would allow for a series of payments for credits accumulated in a single day at a single location or allow payment to proxies.

**C. Even if the statute could be interpreted as allowing for repayment of losses plus $125, the actions of the defendants advancing that argument demonstrate that they have made absolutely no good faith attempt to comply with such an interpretation.**

Even if this court were to have accepted an interpretation which allows for payment of the $125 in addition to a refund of the money placed into the machine, it would find that the present defendants violate the law. This is because the procedures followed by these defendants are clearly not good faith attempts to insure compliance with this interpretation. They are, at most, attempts to use this interpretation to evade the intent of the law even as they claim to understand it. *See* Attachment A (defendant-by-defendant summary of payout practices).

Specifically, each of these defendants either has practices which are inconsistent with its claimed interpretation of the law, or relies on multiple inconsistent interpretations, or both. Further, there is clearly no good faith attempt to confirm "losses." Finally, the minimal documentation maintained is shoddily kept, incomplete, and clearly intended solely to provide cover for the defendants, rather than confirmation of compliance with the law (even as defendants claim to interpret it).

**D. This court's interpretation does not create a conflict between Section 2791 and S.C.Code Sections 32–1–10 & 20 which allow for recovery of losses in excess of fifty dollars.**

A legitimate query is then raised whether this interpretation creates an inconsistency between Section 2791 and the state

---

statute. Instead, the player would be entitled to refund only of the credits *never put into play*.

**31.** Some defendants did assert that this was the "next most reasonable" interpretation af-

ter the "losses plus" interpretation. They did not, however, offer any rationale for why this interpretation should be accepted by the court. It appears that this is simply the next "best" interpretation for defendants, not any logically supportable interpretation.

law allowing for recovery of gambling losses in excess of fifty dollars at one sitting. *See* S.C.Code Ann. §§ 32–1–10 (loss collection by gambler) & 32–1–20 (loss collection by third party). The South Carolina Court of Appeals has repeatedly held that the two are not inconsistent. *See, e.g., Justice v. Pantry*, 330 S.C. 37, 496 S.E.2d 871 (App.1998). As stated in *Justice:*

> After careful consideration, we conclude section 32–1–20 was not impliedly repealed by enactment of the Video Game Machines Act, specifically section 12–21–2791, because these statutes are not repugnant to each other and are not incapable of a reasonable reconcilement. To the contrary, these statutes are consistent. Both statutes promote the same goal of limiting excessive gambling.
>
> Sections 32–1–10 and 20 promote "a policy which prevents a gambler from allowing his vice to overcome his ability to pay. The legislature adopted a policy to protect a citizen and his family from the gambler's uncontrollable impulses." ... This policy is furthered by allowing a gambler to recover excessive gambling losses or another person to recover the losses if the gambler fails to do so. Likewise, the clear intent of section 12–21–2791 is to prevent excessive gambling by limiting the amount of cash payouts for winnings on video poker machines. Each advances the same policy of limiting excessive gambling through different means; sections 32–1–10 and 20 prevent excessive gambling losses and section 12–21–2791 prevents excessive gambling winnings.

*Id.* at 875 (internal citations omitted).

Accepting *Justice* as persuasive authority, this court cannot interpret the payout limit statute in a way that creates a conflict with the statute allowing recovery of losses over fifty dollars. This court, however, concludes that the present interpretation does not create a conflict between these two statutes for the reasons discussed below.[32]

A location is limited in what it can pay to a player for credits remaining on a machine at the conclusion of play. Assuming, that a player ends a series of play (a "sitting"), with a net loss of more than $50 (the money placed into the machine less the cash payouts—which are capped at $125), that player can still make a claim against the operator for return of the net loss to the extent it exceeds $50.

---

32. This conclusion is consistent with this court's analysis in Order No. 42 relating to the same issue:

> At the August 25, 1998 hearing, defendants suggested that the statutory cap had to be read to allow for payment of $125 over the amount deposited in order to avoid conflict with the statute authorizing suit for losses in excess of $50 (S.C.Code Ann. § 32–1–10). The court rejects this argument as an alternative basis for reading the cap as allowing "losses" plus $125. First, the two statutes address different concerns, losses and winnings. By separately limiting each, the legislature limits the incentive to gamble and the risk when one does. *See Justice v. Pantry*, 330 S.C. 37, 496 S.E.2d 871, 875 (App.1998) (statutes setting cap on payout and allowing a cause of action for losses in excess of $50 are consistent; both "promote the same goal of limiting excessive gambling"). Indeed, the potential claim for losses limits the "winner's" incentive to gamble, here, arguably, the video poker operator. Second, the two statutes are not based on the same time frames, thus reading them together raises numerous difficulties. Third, even accepting defendants' analysis that the two should be read together, the result would be for the losses cap to subsume the winnings cap since the former allows for recovery of losses after offset of winnings during the same period. (*See discussion* § II.B.5). The net result would be as if only the cap on losses existed. This is not to suggest that a player could not bring an action or assert a claim for losses even after "winning" the allowable amount ($125) or that a video poker operator could not settle such a claim. However, the circumstances under which such settlements were made would be subject to scrutiny to insure the practice was not simply a ruse for evading the cap on damages (*e.g.* if only claims by net winners, and not net losers were settled). Order No. 42 at 29–30.

**514**

Reading the statutes together, then, would allow the luckiest or most successful players to receive a net gain for play during a single day at a single location of something slightly less than $125 (the net cash payout allowed less the minimum amount placed into the machine to receive a winning hand with a corresponding "payout" of $125). The least lucky or least successful players would be able to recoup all but $50 of their *net* losses in a given sitting by asserting a claim under Section 32–1–10. Losses in this context would be the total money placed into the machine, less any cash payouts received. Never, however, would a person be allowed to reasonably rely on Section 32–1–10 for an actual gain.[33]

Of course, any settlement of any claim under Section 32–1–10 would have to be made in good faith. Critical inquiries in this regard would most likely include, first and foremost, the consistency of the means of settling claims. That is, good faith would only be shown if claims are settled on the same terms and under the same procedures for those who end their sitting with no credits showing and for those who end their sitting with extensive credits showing. For example, players making claims in the divergent situations should be required to provide the same amount of proof of the money deposited and the money, if any, paid out. Further, both types of claims should be resolved by the same position employee and with the same timeliness.

**E. The provisions are enforceable.**

In interpreting a law, this court would not normally address enforceability. In this case, however, this court is being asked not only to interpret the law but also to provide injunctive relief. In addition, suggestions have been made that the law somehow cannot be interpreted as this court suggests because to do so would make it unenforceable. *See also* Order No. 42 quoted above at § I.A.1. This court will, therefore, address this particular issue in some further detail.

As a predicate, this court will note that difficulty of enforcement is not a reason for invalidating a law. Many laws are difficult to enforce, but no less the law. These range from laws prohibiting littering to laws prohibiting the sale of illegal drugs. Any citizen of this state is aware of the widespread violation of both categories of law. The normal response is not to say "Let's interpret the law differently," but rather to step up either efforts at enforcement or the available penalties.[34]

This court does not, in any case, believe the law is unenforceable. One means of enforcement, of course, is the use of undercover agents to play the machines and see if excess payouts are made. This is apparently the primary method now used. *See Video Games Machines Field Enforcement and Procedures Manual* (DOR August 1996) (hereafter *"DOR 1996 Field Manual"*) at 13 (indicating enforcement through undercover agents playing machines).

---

**33.** For example, if a player puts in $2000 and wins a jackpot equaling or exceeding $125, the payout would be limited to $125. In addition, the player would have a claim under Section 32–1–10 for $1825 (net loss of $1875–$50). Thus, the player's net recovery after payout and claim for losses would be $1950.

Likewise, if a player puts in $2000 and does not win anything, the player could recover $1950 under Section 32–1–10 (net loss of $2000–$50). In other words, the net would be the same, thus discouraging any player from wagering an excessive amount in hopes of a large jackpot. As intended by both statutes, both the machine operator (by § 32–1–

10) and the player (by § 12–21–2791) would be encouraged to keep wagers (and thus losses) low. Only the player wagering less than $125 could even hope for a net gain.

**34.** As discussed above, defendants offered alternative interpretations that do not make the law more enforceable but less so. For example, without designing the machines to record the amount of money deposited (which defendants presumably could, but have not, required) there is no way to confirm or even audit whether payouts of "losses plus $125" are made legitimately. By contrast, a flat limit of $125 is far more easily confirmed through audit.

Another and likely more effective means is the time-honored method of most revenue agencies: the requirement for a paper trail, the auditing of that trail, and the availability of other penalties for any false statements.[35] Indeed, the 1993 *DOR Guide* suggested that this was the originally-intended method for confirming profits and, presumably, controlling and avoiding excessive payouts: "In order to ensure compliance with these provisions, licensed establishments must keep two logs, a machine log and a cash payout log.... [T]he licensed establishment must [also] maintain a numbered receipt book. Each player receiving a cash payout must be given a receipt containing [specified information including the signatures of the player and employee]." *DOR Guide* at 7; *see also DOR 1996 Field Manual* at 14 (discussing records of payouts each location is required to keep, citing S.C.Code § 12–54–210). The log requirements were very extensive, requiring complete identifying information as to the person receiving the payout (including social security number), the day, date and time of the payout, the number of credits remaining on the machine when the player requested the cash payout, the amount of the cash payment and corresponding number of credits, and the number of the receipt provided. This court has been presented with no information as to why this very logical procedure has not since been followed, but there is no evidence that the log requirements have, in fact, been enforced.[36] Indeed, there is at most some evidence of very sloppily kept logs which request limited information, contain even less, and are used more for the purpose of assisting the operator in evading the law than in insuring compliance. *See* Attachment A.

Certainly, papers can be falsified just as fraudulent checks are passed and fake ID's are used every day.[37] This does not pre-

35. The court acknowledges that the keeping of such records would place some burden on what are primarily clerical employees. This, however, is hardly anything unusual. One need only seek a refund at any department store to understand that paperwork is the norm and not the exception when a business allows its employees to dispense even small amounts of cash. Moreover, it is highly unlikely that clerical employees would be willing to subject themselves to criminal penalties for false statements on official forms in order to illegally increase profits for their employer— and certainly not without direction to do so. In the event an employee was so directed by his or her employer, one can only assume that an audit demonstrating false statements by the employee would lead to the disclosure of the instruction from the employer.

36. This court notes that the Department of Revenue has a somewhat unusual dual role. It is, as its name suggests, responsible for collecting taxes and revenues for the state. Thus, what might be considered its primary (or at least more historical) role in regard the video game machines to is to insure that the state receives the proper tax revenue from their operation. DOR has also, however, been given responsibility for designing and enforcing regulations implementing the laws which protect the public from improper operation of video gambling machines. Indeed, although it appears that SLED is the primary enforcer of the regulations and statutes relating to prohibited activities, the Attorney General of the State has deferred to DOR for the proper interpretation of the law and appropriate means of enforcement.

37. In support of a defense of unclean hands, defendant Collins submitted the following testimony of one of the moving plaintiffs:

Q I believe in a previous deposition you said you would get a number of these $125 vouchers?
A Yes, Sir.
Q Ms. Pillas was one that cashed them all and had you sign funny names for them?
A Yes, Sir.

 \* \* \* \* \* \*

A ... I will say the showboat was a place that they didn't make you sign, but they had a clipboard, the room attendant, and she would write a list of fictitious names on the clipboard and then when you won, it was kind of a joke, "Who do you want to be?" and she would write your winnings down.
Q Who did that?
A The room attendant at the showboat. She would write your winning amount by whichever name was on there. And they would sit there all day and write clipboards of names, but I have never had to sign anywhere else.

Coulter depos. at 85–86.

vent stores from requiring the presentation of identification to confirm that a purchaser of alcohol is at least twenty-one or that a person writing a check appears to be the person whose name appears on the check. In short, the requirement for a paper trail, coupled with reasonable and normal business practices, should make this law reasonably enforceable. This court simply cannot assume that enforcement would be fruitless if the entities and individuals involved were faced with a clear enunciation of the law and a realistic possibility of appropriate penalties.[38]

Finally, this court must note that the greatest difficulties with enforcement come not from this court's interpretation, but from the various interpretations suggested by the defendants. These interpretations make the law either meaningless, or nearly impossible to enforce, or both.

### F. All defendants are chargeable with knowledge of and responsibility for violations which occur on machines either operated by or leased by them to third parties.

■ As the facts clearly demonstrate, all defendants either operate the machines directly or through lease arrangements which result in the splitting of profits. For the "profits" to be determined, the lessor must know what cash amounts are paid out. This is determined either by blindly taking the word of the location operator, which no lessor suggests to be its practice, or by reconciling the machines' records which include, most significantly, what are alternately referred to as "payout tickets," "pay tickets" or "vouchers." Any reasonable review of these documents would demonstrate how payouts are being made.[39] Thus, it is beyond dispute that the defendants who are lessors and who split profits with locations have the means of knowledge of how payouts are made at the locations and are chargeable with actual knowledge. Only willful blindness would prevent actual knowledge.

In this regard, one lessor defendant suggested that its role was nothing more than the equivalent of an automobile manufacturer who designed a car capable of going 120 miles per hour. This defendant argued that it was the location that decided how fast to go. This analogy must be rejected. It is this lessor who is responsible for all aspects of the machines' actual functioning including what jackpot is displayed and how payout tickets are pro-

---

**38.** This court has deferred ruling on whether South Carolina law makes excess payouts a violation of the Section 12–21–2804(B) which prohibits "special inducements" and provides for imprisonment for up to two years (§ 12–21–2804(F)). DOR has recently published a Revenue Ruling which states its position that the criminal penalty is not applicable. DOR Ruling 99–7. However, regardless of whether Section 2804 applies, penalties are available. DOR's internal guidelines relating to violations of Section 2791 provide for progressive penalties as follows: (1) First offense$500; (2) Second offense—$500 and revocation of the location operator's retail sales tax license; (3) Third offense—"$500 and revocation of all licenses issued by the department and held by the operator of the single place or premises, regardless of whether ... the licenses are for the premises in violation." S.C. Revenue Procedure # 97–2. Thus, even under DOR's interpretation, any location which engages in a pattern of prohibited behavior faces the loss of its ability to do business at that location and other locations.

**39.** A particular location which was actually complying with the law would only pay out $125 on the first slip printed out. Remaining credits would then be canceled in some manner which, apparently, can only be done by printing out but refusing to pay on the remaining slips. Regardless of how it was done, this would result in a very different, indeed much higher profit calculation since all credits remaining at the close of play would not be redeemed for cash. Certainly, such successful businesses as the lessor defendants would have a means of knowing if credits were canceled rather than paid given the direct impact on profits. No such method has, however, been suggested to this court in the face of compelling and uncontradicted evidence of routine print out of payout slips demonstrating multiple payments of $125 to a single player for a single period of play by a single location.

duced. This defendant settles up with the location by determining profits which, in turn, are determined or confirmed using the machines' own records. In short, a better analogy would be that this defendant sets the cruise control at 120 mph, rather than merely designing a car capable of going 120 mph.

## II. Violation of the South Carolina Unfair Trade Practices Act

■ The South Carolina Unfair Trade Practices Act, makes it unlawful to engage in "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C.Code Ann. § 39–5–20. "An act or practice is ' "unfair" when it is offensive to public policy or when it is immoral, unethical, or oppressive; a practice is "deceptive" when it has a tendency to deceive.' " S.C. Law of Torts at 372 (quoting *Young v. Century Lincoln–Mercury, Inc.*, 302 S.C. 320, 396 S.E.2d 105, 108 (Ct.App.1989) *affirmed in part, reversed in part, on other grounds*, 309 S.C. 263, 422 S.E.2d 103 (1992) (*per curiam* )).

Private causes of action for violation of this statute are authorized by S.C.Code Ann. § 39–5–140 (1985), which provides for treble damages and "such other relief as [the court] deems necessary or proper" when willful violations are found and for actual damages and attorneys fees and costs in any case resulting in a finding of violation of the statute. The statute is not, however, applicable to "[a]ctions or transactions permitted under laws administered by any regulatory body or officer acting under statutory authority of this State or the United States or actions or transactions permitted by any other South Carolina State law." S.C.Code Ann. § 39–5–40(a).

This "regulated industry" exception was addressed in *State ex rel McLeod v. Rhoades*, 275 S.C. 104, 267 S.E.2d 539 (1980) *holding modified by Ward v. Dick Dyer & Assoc. Inc.*, 304 S.C. 152, 403 S.E.2d 310 (1991), which held that "[i]nitially the burden is on the party seeking the exemption to demonstrate [that the

transactions at issue are regulated]. Once the exemption is demonstrated, the complainant must then show that the specific act in question does not come within the exemption." *Rhoades*, 267 S.E.2d at 541 (finding securities transactions to fall within the exemption). This holding was later applied by the South Carolina Court of Appeals to exempt any transaction if the general activity at issue was regulated. *See Scott v. Mid Carolina Homes, Inc.*, 293 S.C. 191, 359 S.E.2d 291 (Ct.App.1987) *overruled by Ward*, 304 S.C. 152, 403 S.E.2d 310 (1991).

Because the industry at issue is regulated under the Video Game Machines Act, one group of defendants previously argued that any action for redress could only be brought by the South Carolina Attorney General who has, as noted above, now declined to pursue any ruling from this court, except as to the lottery issue. This argument appears to be based on the "general activity" analysis used in *Rhoades* and *Scott*.

■ The "general activity" test announced in *Rhoades* was, however, later rejected by the South Carolina Supreme Court in *Ward v. Dick Dyer and Associates, Inc.*, 304 S.C. 152, 403 S.E.2d 310 (1991). That court explained its reasoning as follows:

> After much research and consideration of the events concerning the regulation of businesses during the past ten years since the *Rhoades* decision, we believe that a "general activity" test would not fulfill the intent of the Legislature in prohibiting unfair trade practices. We believe that the exemption is intended to exclude those actions or transactions which are allowed or authorized by regulatory agencies or other statutes.... [W]e believe that the intent of our Legislature was to exclude activities which would otherwise be allowed or authorized.

*Ward*, 403 S.E.2d at 312. Some of the defendants previously argued based on *Ward* that the allegedly wrongful conduct

is not only strictly regulated by the State, but it has also been specifically permitted by statute and by the Department of Revenue. As discussed above in regard to the interpretation of Section 2791, there is no support for this contention. The law does not allow for the payment of more than $125 at the conclusion of play. While the cap may have been poorly enforced, there is no showing that any relevant state agency or authority has done anything to suggest that the law means anything other than what this court has concluded it means. Defendants cannot, therefore, find protection in the "regulated activity" exemption to the SCUTPA.

 In this motion, plaintiffs assert that they are entitled to partial summary judgment that certain specified defendants' practices in regard to offering and making cash payouts in excess of those allowed by Section 2791 constitute unfair or deceptive practices as prohibited by SCUTPA. This court finds that these defendants' activities violate SCUTPA in various respects.

First, because there is a statutory limit on the amount which can be paid out, the offering of "jackpots" in excess of this limit is inherently misleading unless clarification is provided. This is because the display of a jackpot without an equally clear and visible explanation of any qualification on payout suggests not only that the payment is perfectly legal but that it will be paid, if won, without any further conditions.[40] To the extent any player learns of the illegali-

ty or conditions on payout at a later time, there is an inherent misrepresentation.

Moreover, and perhaps more importantly, the payment of cash in excess of the statutory cap is necessarily a violation of the public policy of this state as expressed in the state's statutes. The operators also engage in unethical behavior by devising a variety of schemes to evade detection of the violations. This includes any device which purports to make payments over a series of days, the payment to proxies or to players under names known by the operator to be false, the use of facially invalid "trust" agreements, or any other scheme to evade the limit or detection. These attempts at evasion are made more, not less, egregious by some of the defendants' attempts to shift blame to the payees. The latter is accomplished by encouraging the players to sign documents that the defendants cannot in good faith believe to be true or valid.[41]

The degree of repetition and thus "public impact" is extraordinary. The record suggests that these practices are engaged in daily by the defendants or others acting for the mutual benefit of the defendants and themselves.[42] At best, they argue ignorance. Defendants offer nothing to counter the evidence that violation of the law is the routine practice. Indeed, the suggestion is not that the practices are infrequent but that they are so frequent, common, and pervasive in that no operator can compete in this industry without violating the law. *See supra* n. 15 (quoting

---

**40.** At least one defendant conceded that players have occasionally balked when asked to sign a form stating that the payout is not more than $125 over what was put in. It does not, however, appear that these players are among the moving plaintiffs.

**41.** On this point, defendants suggest an *in pari delicto* defense. The translation ends the inquiry—the phrase means "in equal fault." The operators and machines at issue are licensed to operate in a regulated area of the law. They should, therefore, be held to a greater knowledge and understanding of the laws than their customers, particularly where the laws are designed to protect the player

from his or her own bad judgment. In any case, what the law prohibits is the *making* of payouts in excess of the statutory cap. It does not directly address the *receipt* of the funds. Thus, while this court is not willing to suggest that the player who receives an excess payment is without fault, the fault or culpability is certainly not "equal."

**42.** This court has reached this conclusion without deciding if the lessor defendants engage in "joint ventures" with their lessees. The clear evidence of involvement, knowledge and profit from the prohibited activity is enough to hold all defendants responsible for the resulting unfair and deceptive activities.

Ingram); Attachment A (discussing Jordan's decision to violate law to remain competitive). To the extent this may be offered as an excuse, any such defense is rejected.[43]

■■■ There is evidence in the record that the present plaintiffs have suffered some harm as a result of these unfair trade practices. The degree of harm and level of causation is, however, particularly hard to define as each player was drawn to the machines initially for a variety of reasons and continued (or continues) to play for a variety of reasons. This court will not, therefore, make a determination as to the extent of damages or causation. That must be reserved for the jury. This does not, however, preclude the court from rendering partial summary judgment on the legal issue whether the complained of acts constitute unfair trade practices. The practices are so flagrant, so obviously violative of public policy, and so fraught with deception and unfairness that this court cannot but conclude that they constitute unfair trade practices as a matter of law.

## III. Injunctive relief.

Having determined that the actions at issue violate the law and constitute unfair trade practices as a matter of law, this court must next inquire whether its legal ruling is adequate or whether the plaintiffs are entitled to injunctive relief. The plaintiffs argue that injunctive relief is available both under SCUTPA and under the inherent authority of the court.

43. This court cannot condone such a defense any more than it could condone a defense by a respected physician that it was necessary to "pad the medicare bills" or offer patients unnecessary narcotic prescriptions to remain competitive. What is necessary to compete can never be defined in terms of keeping up with competitors who are themselves in violation of the law.

44. The only state court opinions presented to this court which granted injunctive relief to private litigants for SCUTPA violations did so under the court's inherent authority. *See Shoreline Rentals, Inc. v. Sea Pines Assoc., Inc.,* C/A No. 97–CP–07–2078 (Beaufort Coun-

## A. Injunctive relief under SCUTPA

Under SCUTPA, plaintiffs argue both that the specific moving plaintiffs are entitled to injunctive relief to protect their individual interests and that these plaintiffs may act as private attorneys general. The availability of injunctive relief to individual plaintiffs is, however, uncertain under SCUTPA.[44] The statute gives the Attorney General clear and extensive authority to seek injunctive relief.[45] S.C.Code Ann. § 39–5–50. As to private litigants, injunctive relief is granted, if at all, under Section 39–5–50(b) (relief to *restore* losses) and Section 39–5–140 (allowing court to award "other relief"). These sections may, but do not clearly, authorize injunctive relief. Further, assuming injunctive relief is available to a private litigant, it seems unlikely that the statute would allow for private parties to act as. private attorneys general since the statute expressly precludes private actions brought in any representative capacity. S.C.Code Ann. § 39–5–140(a). Thus, while this court would find more than adequate grounds for injunctive relief if the plaintiffs could pursue relief as private attorneys general, it finds the legal premise to be unsupported.

Under these circumstances, the court finds it doubtful that it could grant injunctive relief to plaintiffs under the SCUTPA at this stage in the proceeding. By contrast, SCUTPA makes clear that its remedies and protections are merely supplementary to those otherwise available.

ty, Common Pleas, May 19, 1998 and April 7, 1998).

45. As previously noted, the Attorney General initially joined plaintiffs in their pursuit of injunctive relief but later withdrew from that request. His rationale was, in part, that he would defer in such matters to the regulatory department, DOR. DOR is not a party to this action and, in any case, the statute does not suggest that any agency other than the Attorney General can pursue injunctive relief on behalf of the state. As stated in Order No. 42, this creates a significant enforcement gap. Order No. 42 at n. 18.

## B. Injunctive relief under inherent powers of the court

### 1. Court's equitable powers to grant injunctions

In this case, plaintiffs have moved for partial summary judgment on the issue of permanent injunction. *See Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.,* 43 F.3d 922 (4th Cir.1995) (permanent injunction granted on summary judgment motion). For the most part, defendants do not contest the factual basis of plaintiffs' motion, but object on procedural grounds. Defendants argue that this court cannot grant a permanent injunction because state law does not allow this court the ability to grant such relief. The court disagrees.

 Federal courts have inherent power to grant appropriate relief. *Culpepper v. Reynolds Metals Co.,* 421 F.2d 888 (5th Cir.1970). It is well recognized that a federal district court has wide discretion to fashion appropriate injunctive relief in a particular case. *Richmond Tenants Organization, Inc. v. Kemp,* 956 F.2d 1300 (4th Cir.1992) (citing *Lemon v. Kurtzman,* 411 U.S. 192, 200, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151 (1973)). This inherent equitable power of the federal court to fashion remedies is not dependent upon substantive state law. This principle has been clearly established for many decades under the authorities of the United States Supreme Court, as well as the Fourth Circuit Court of Appeals.

In 1944, the Fourth Circuit Court of Appeals declared:

> [W]hether injunction will be granted or not is not a matter as to which we look to state law for guidance. We look to state law to determine what the rights of the parties are; but we look to the federal practice to determine the remedies available in the federal courts for their protection in a federal suit in equity.

*Purcell v. Summers,* 145 F.2d 979, 990 (4th Cir.1944) (citing, *inter alia,* four United States Supreme Court cases). The Fourth Circuit based its reasoning on well-settled Supreme Court precedent:

> We think that this must be deemed to be an indication from the Supreme Court that in so far as equitable remedies are concerned federal courts are to grant them in accordance with their own rules which have been developed out of the English Chancery practice. The words of Mr. Justice Frankfurter in the *Ticonic Bank* case are a plain indication that the rule enunciated in *Payne v. Hook,* "The equity jurisdiction conferred on the Federal Courts is the same that the High Court of Chancery in England possesses; is subject to neither limitation or restraint by State legislation, and is uniform throughout the different States of the Union," is the law so far at least as the granting of equitable remedies is concerned. The rule of *Erie R. Co. v. Tompkins* being determinative of substantive rights, there is still preserved to the federal courts a uniform basis for granting equitable remedies in cases in which substantive rights have arisen under state law.

*Purcell,* 145 F.2d at 991 (citations omitted).

One year later in 1945, the Supreme Court, in an unrelated case, confirmed the analysis of the Fourth Circuit, explaining that equitable remedies are available to federal courts, although they may not be available under the substantive state law:

> Partly because the States in the early days varied greatly in the manner in which equitable relief was afforded and in the extent to which it was available, Congress provided that "the forms and modes of proceeding in suits ... of equity" would conform to the settled uses of courts of equity. But this enactment gave the federal courts no power that they would not have had in any event when courts were given "cognizance", by the first Judiciary Act, of suits "in equity." From the beginning there has been a good deal of talk in the cases that federal equity is a separate legal system. And so it is, properly understood. The

suits in equity of which the federal courts have had "cognizance" ever since 1789 constituted the body of law which had been transplanted to this country from the English Court of Chancery. But this system of equity "derived its doctrines, as well as its powers, from its mode of giving relief." In giving federal courts "cognizance" of equity suits in cases of diversity jurisdiction, Congress never gave, nor did the federal courts ever claim, the power to deny substantive rights created by State law or to create substantive rights denied by State law.

This does not mean that whatever equitable remedy is available in a State court must be available in a diversity suit in a federal court, or conversely, that a federal court may not afford an equitable remedy not available in a State court. Equitable relief in a federal court is of course subject to restrictions: the suit must be within the traditional scope of equity as historically evolved in the English Court of Chancery; a plain, adequate and complete remedy at law must be wanting; explicit Congressional curtailment of equity powers must be respected; the constitutional right to trial by jury cannot be evaded. That a State may authorize its courts to give equitable relief unhampered by any or all such restrictions cannot remove these fetters from the federal courts. *State law cannot define the remedies which a federal court must give simply because a federal court in diversity jurisdiction is available as an alternative tribunal to the State's courts. Contrariwise, a federal court may afford an equitable remedy for a substantive right recognized by a State even though a State court cannot give it. Whatever contradiction or confusion may be produced by a medley of judicial phrases severed from their environment, the body of adjudications concerning equitable relief in diversity cases leaves no doubt that the federal courts enforced State-created substantive rights if the mode of proceeding and remedy were consonant with the traditional body of equitable remedies, practice and procedure, and in so doing they were enforcing rights created by the States and not arising under any inherent or statutory federal law.*

*Guaranty Trust Co. of New York v. York,* 326 U.S. 99, 104–07, 65 S.Ct. 1464, 1467–69, 89 L.Ed. 2079 (1945) (internal citations omitted) (emphasis added).

The Fourth Circuit has in recent years cited and applied the rule in *Guaranty Trust.* In *SSMC, Incorporated v. Steffen,* 102 F.3d 704 (4th Cir.1996), the appellant argued that the district court erred because it allowed a remedy not found in, or sanctioned by, Article 9 of the Uniform Commercial Code. Relying in part on *Guaranty Trust,* the Fourth Circuit rejected this argument:

> However, as the Supreme Court noted long ago: "[s]tate law cannot define the remedies which a federal court must give simply because a federal court in diversity jurisdiction is available as an alternative tribunal to the State's courts." *Guaranty Trust Co. v. York,* 326 U.S. 99, 106, 65 S.Ct. 1464, 1468, 89 L.Ed. 2079 (1945). Moreover, a court's equitable powers can extend to setting aside or enjoining the enforcement of rights purportedly created by a tainted transaction. *See, e.g., Mills v. Electric Auto–Lite Co.,* 396 U.S. 375, 385, 90 S.Ct. 616, 622, 24 L.Ed.2d 593 (1970).

*Steffen,* 102 F.3d at 708. Thus, the Court of Appeals concluded that the district court did not err in adopting an equitable remedy not specifically set forth in the U.C.C. *Id.* at 709.

Accordingly, the clear line of authority from both the United States Supreme Court and the Fourth Circuit Court of Appeals teaches that district courts are empowered to fashion appropriate equitable remedies, regardless of whether such remedies are provided under state law.

**2. Standards for granting injunctions**

After ascertaining that this court is empowered to grant equitable relief, the court

must next determine whether the standards for granting injunctions are satisfied in this case. Perhaps the most significant single component in the judicial decision whether to exercise equity jurisdiction and grant permanent injunctive relief is the court's discretion. 11A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2942. The court is granted full discretion to determine whether or not to grant the requested relief. *See Hecht Co. v. Bowles*, 321 U.S. 321, 329, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944) ("An appeal to the equity jurisdiction conferred on federal district courts is an appeal to the sound discretion which guides the determinations of courts of equity."); *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922 (4th Cir.1995) (the granting or denial of a permanent injunction is reviewed for abuse of discretion).

■ In exercising its discretion, the court must determine whether plaintiffs have an adequate legal remedy. Courts generally will refuse to grant injunctive relief unless the plaintiff demonstrates that he does not have an adequate legal remedy. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992).

> What constitutes an adequate legal remedy depends on the facts of each case. The requirement no longer is as difficult to satisfy as it once was. For example, one court has stated that "an adequate remedy at law means a remedy which is plain and complete and as practical and efficient to the ends of justice and its prompt administration as a remedy in equity by injunction."

Wright, Miller & Kane § 2944 at 86.

Probably the most common method of demonstrating that there is no adequate legal remedy is by showing that plaintiff will suffer irreparable harm if the court does not intervene and prevent the impending injury. Wright, Miller & Kane § 2944. Irreparable injury is simply a finding that the harm that has or will occur cannot be repaired. In the words of Judge Friendly,

> A plaintiff asking an injunction because of the defendant's violation of a statute is not required to show that otherwise rigor mortis will set in forthwith; all that "irreparable injury" means in this context is that unless an injunction is granted, the plaintiff will suffer harm which cannot be repaired.

*Studebaker Corp. v. Gittlin*, 360 F.2d 692, 698 (2d Cir.1966).

■ Furthermore, equitable relief is appropriate if a plaintiff can demonstrate that effective legal relief can be secured only by a multiplicity of actions, as, for example, when the injury is of a continuing nature, so that plaintiff would be required to pursue damages each time he was injured. *See Roof v. Conway*, 133 F.2d 819 (6th Cir.1943); *Blue Sky Entertainment, Inc. v. Town of Gardiner*, 711 F.Supp. 678, 697 (N.D.N.Y.1989). An adequate remedy at law may be unavailable when defendant repeatedly commits allegedly harmful acts. 13 James Wm. Moore, *Moore's Federal Practice 3d* § 65.06[1].

In most cases the determination of whether to issue an injunction involves a balancing of the interests of the parties who might be affected by the court's decision—the hardship on plaintiff if relief is denied as compared to the hardship to defendant if it is granted. Wright, Miller & Kane § 2942. In this case, there is minimal legal hardship on defendants. They are simply being required to comply with the law, to refrain from deceiving customers (by posting notices of payout limitations), and to follow reasonable procedures to insure compliance by their employees. By contrast, there is a risk of substantial hardship to the moving plaintiffs to the extent they continue to use defendants' machines and to the general public to the extent defendants continue to engage in these practices which are clearly violative of the law (S.C.Code Ann. § 12–21–2791 and SCUTPA).

■ The function of injunctive relief is to forestall future violations. *United*

*States v. Oregon State Med. Soc'y*, 343 U.S. 326, 72 S.Ct. 690, 96 L.Ed. 978 (1952). All it takes to make the cause of action for relief by injunction is a real threat of future violation or a contemporary violation of a nature likely to continue or recur. *Id.; Phillips v. Crown Central Petroleum Corp.*, 602 F.2d 616 (4th Cir.1979) (a future injury of uncertain date and incalculable magnitude is irreparable harm, and protection from such an injury is a legitimate end of injunctive relief); *see also United States v. Articles of Drug*, 825 F.2d 1238 (8th Cir.1987) (district court may issue an injunction if it concludes that the injunction is necessary to prevent future violations). In fact, the Fourth Circuit Court of Appeals has stated that an injunction is the preferred remedy to insure that future violations will not occur. *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922 (4th Cir.1995).

When the public interest is involved in a proceeding, the court's equitable powers assume an even broader and more flexible character than when only a private controversy is at stake. *Porter v. Warner Holding Co.*, 328 U.S. 395, 398, 66 S.Ct. 1086, 1089, 90 L.Ed. 1332 (1946). Courts of equity may, and frequently do, go further to grant relief in furtherance of the public interest than when only private interests are involved. *Yakus v. United States*, 321 U.S. 414, 441, 64 S.Ct. 660, 675, 88 L.Ed. 834 (1944); *see Peabody Holding Co. v. Costain Group PLC*, 813 F.Supp. 1402 (E.D.Mo.1993) (public interest supported permanent injunction against sale of certain properties in breach of prior agreement with another buyer, although only private parties were involved). For example, in *Lone Star Steakhouse & Saloon*, the Fourth Circuit found that an injunction would serve the public interest by preventing future consumers from being misled. *Lone Star Steakhouse & Saloon*, 43 F.3d 922.

It is apparent that the form of injury caused by defendants' ongoing and systematic violation is difficult to remedy from a purely legal standpoint. In part, this derives from the myriad factors that influence every personal decision to play video poker and the resulting difficulty of proof as to which factor had what effect. For example, while it can be known that the offering of jackpots is a factor in inducing a person to begin and continue play of these machines, proof of each of the following will prevent a host of difficulties: (1) the degree of causation of the initial decision to play; (2) the degree of causation of any addiction; (3) the degree of causation of each decision to play or continue playing; (4) the degree of causation of related life problems. Legal relief is, moreover, inadequate to compensate for resulting life problems such as bankruptcy, destroyed marriages and lost jobs. Similarly, the defendants' actions in involving the players in false statements in order to allow defendants to evade the law creates additional problems of proof and possible challenges to legal relief. For all of these reasons, this court finds as to these plaintiffs and players in general that legal relief alone is not adequate.

■ This court has, then, determined that it has the inherent authority to prohibit activity where it is necessary to protect plaintiffs and the public and to effectuate this court's judgment. Under this standard, this court has no difficulty concluding that injunctive relief is necessary and appropriate. The flagrant and extensive violation of the law confirms the statement of a DOR attorney made to this court at an earlier hearing to the effect that when cited for violation of the law, the operators simply pay the fine and move on, treating the $500 fine as a cost of doing business.[46] It is clear from this uncontradicted statement, from the defendants'

---

46. During the October 2, 1998 hearing, a State's attorney responsible for enforcement of the Act informed this court that violators routinely pay a $500.00 fine and continue about their business. *See*, statement of Jeffrey Nelson (Transcript of October 20, 1998, hearing p. 9, lines 17–22; p. 55, line 22; p. 56, line 11). DOR has made similar state-

own testimony and from all other evidence before this court that there is no deterrent effect in the current enforcement scheme.[47] More significantly, it is more than apparent to this court that its rulings as to the meaning of the statute and the status of the defendants' actions as violative of the SCUTPA will be of no effect without an injunction. The injunction, in turn, will be of no effect without an adequate enforcement mechanism.

This court, therefore, concludes that it should issue an injunction to the following effect:

1. Prohibiting the payment of more than $125 for credits remaining on a machine at the conclusion of play. All other credits must be removed from the machine at the time the player receives the cash payout. No other payment or compensation may be given to the player at that time or any later time as payment for the unpaid credits.

2. Requiring the posting of a clarifying sign on every machine which states: "Regardless of the number of credits accumulated or the size of the jackpot displayed on this machine, no cash payout will be made in excess of $125. All other credits remaining at the conclusion of play will be deleted from the machine. You will be required to sign for and provide identifying information to receive a cash payout." The sign must be of a size, type and configuration intended to attract the players' attention and must be placed to insure that players' attention is drawn to the sign. Defendants desiring a safe-harbor for compliance may copy the attached notice in dark letters on a white background and post the notice on each machine at the players' eye level or at the same level as any jackpot display. Order No. 68, Attachment A.

3. The court will suggest but will not require that the defendants with the capacity to do so program their machines to automate the required process. That is, the machines would print out a single ticket at the time a player ends play that reflects the number of credits converted to cash (for a maximum payout of $125) and the number of credits deleted from the machines. The machine would also delete the credits in excess of those allowed to be redeemed. Programming of this nature should make accounting and compliance far easier.

4. The defendants subject to this order shall maintain a log or require locations who lease their machines to maintain a log that fully identifies the person receiving any cash payout by name, address, phone, social security number and some form of identification. The log will indicate the number of credits at the conclusion of play, the credits converted to cash, the amount of cash paid out, and the number of credits deleted. It will also reflect (by ticket number) and shall have attached all relevant documentation such as the payout slips printed by the machine. The log must be signed under penalty of perjury by both the person receiving the cash payout and the employee dispensing any cash payout. Absent court approval to the contrary, defendants shall use a form substantially similar to the attached form. Order No. 68, Attachment B.

5. Each employee who is authorized to make payouts shall, at the end of each shift, sign a statement under penalty of perjury confirming that he or she has made no payments to players that are not accurately reflected on the cash payout log referenced above. Order No. 68, Attachment C.

---

ments in documents filed recently in response to some operator's efforts to reopen *Reyelt. Supra* n. 8 & 27.

**47.** According to statistical information from DOR, the average gross profit per machine per year is approximately $25,000. This translates to $480 per week. Thus, a single fine of $500 is little more than a week's profit. Given the apparent industry presumption that enforcement of or compliance with the statutory cap will result in far fewer dollars being placed into the machines, it is easy to see why such a minimal fine has so little effect.

6. No defendant shall modify or allow modification of a machine in a manner intended to make compliance with this order more difficult to enforce or confirm.

7. The logs required above shall be made available on request to appropriate law enforcement agencies, this court, or counsel for plaintiffs. Counsel for plaintiffs must request the logs through counsel for the defendants by date and location. If requested by plaintiffs, the logs must be provided within three business days of receipt of the request. Plaintiffs' counsel shall be required to strictly protect information contained on the log absent express authorization from this court. Plaintiffs' counsel may not contact persons listed without authorization from this court.

8. Any defendant which operates machines must insure compliance with the above requirements at every location.

9. Any defendant which leases machines to third parties is required to provide all leasing locations with a copy of Order No. 68 with clear instructions that compliance is required. Lessors shall confirm compliance at the time any profits are divided and shall bring any failure of the locations to comply with Order No. 68 to the attention of this court. Depending on the circumstances demonstrated, noncompliance by locations may be considered contempt by both the location and the lessor. *See infra* note 48.

## IV. Matters remaining under advisement.

This court has deferred ruling on various issues related to plaintiffs' RICO claims including (1) whether payouts in excess of the statutory cap may constitute special inducements under S.C. Code Section 12–21–2804(B) punishable under S.C. Code Section 12–21–2804(F) and (2) whether any other state law criminal prohibition may serve as a threshold for plaintiffs' RICO claims. The latter arguments were not squarely raised by the initial summary judgment motion. Defendants shall, therefore, be allowed until May 5, 1999, to file memoranda addressing these state law issues and related grounds for relief under RICO. Plaintiffs may reply no later than May 12, 1999. The court expects to resolve these issues on the briefs.

As to the "inducement" issue and related RICO arguments, this court will defer resolving the issue until it has had an opportunity to review the appellate record in *Gentry v. Yonce.* After review of that record, this court will decide whether it should defer until a decision by the South Carolina Supreme Court can be issued on the common issue of state law underlying *Gentry* and plaintiffs' RICO claims in this case. As the *Gentry* matter is scheduled for oral argument before the South Carolina Supreme Court in June, this would likely delay a decision by this court on this grounds for relief under RICO for at least several months. Alternatively, this court will issue its own ruling which, as it has indicated, would in all likelihood be that excess payouts may constitute inducements under Section 2804(B), punishable under Section 2804(F). As this court has previously stated, absent persuasive or binding authority to the contrary, this court would view any offer or payment of cash in excess of the statutory cap to logically fit within the meaning and intent of Section 2804's prohibition on "special inducements."

While this court's tentative position may indeed be dicta at this stage, it is included here for two purposes. First, to explain why the court is not persuaded that it should defer ruling on the present motion based on the possible loss of primary jurisdiction at some point in the future, such jurisdiction might be lost if the South Carolina Supreme Court determines that excess payouts do not constitute inducements under Section 2804 *and* if this court determines that no other RICO claim can survive.[48] Assuming that both eventualities occur, it would likely not be until several

---

**48.** In addition to allegations of inducements based on excessive jackpots and payouts,

months hence. At that point, should the RICO claims no longer be viable, this court would need to make the *discretionary* decision whether to remand this case to state court. Thus, the loss of jurisdiction is far from certain and certainly not imminent. Under these circumstances, this court sees no reason to delay advancing this nearly two year old case.

The other reason for providing notice of this court's interpretation is simply an effort to avoid further unnecessary damages to plaintiffs and potential liability on defendants. Given that the payout cap is clear, there is no reason for any defendant to continue to make payments in violation of the law. Given clear notice that the violation of the payout cap may also constitute criminal activity, defendants may not hereafter claim reasonable reliance on any belief that although aware the payouts were prohibited by law they did not have fair notice that excess payouts might subject them to liability under RICO and Section 2804.

### Conclusion

For the reasons discussed above, this court grants summary judgment to plaintiffs declaring the proper interpretation of S.C.Code Ann. § 12–21–2791, prohibiting further violations by the defendants who are subject to this motion and others acting in concert with them,[49] and providing for procedures to effectuate this order. The court further grants summary judgment to plaintiffs by finding that defendants' activities as discussed above

constitute unfair trade practices. Any determination whether these practices have caused legally compensable harm and the resulting degree of damages is reserved for determination by jury trial.

A separate order is issued in conjunction with this opinion. *See* Order No. 68.[50] The injunctive relief shall take effect at 12:00 noon on Monday, May 10, 1999. The judgment hereby granted is rendered pursuant to Fed.R.Civ.P. 56(a) and (d).

Inasmuch as the court has granted permanent injunctive relief, it appears that defendants affected by this order would be permitted to take an immediate appeal thereof. However, at the request of defendant Collins Entertainment Corporation, and in order to be absolutely certain that an appeal may go forward, the court hereby determines that there is no just reason for delay in entry of judgment as to this aspect of the case, and for this reason, the court will direct the Clerk of Court to enter final judgment pursuant to Fed. R.Civ.P. 54(b) against the eight defendants named above as to the plaintiffs' claim for permanent injunctive relief.

IT IS SO ORDERED.

### Memorandum Opinion to Order No. 68

#### Attachment A

#### Pedroland, Inc.

Pedroland, Inc. acknowledges that this court held in a preliminary ruling that the legal payout limit is $125 regardless of the money deposited. It is at least on notice of the same interpretation by DOR and

---

plaintiffs have filed affidavits which claim that they have been provided free food and drinks to keep them at the machines. Other testimony and affidavits claim plaintiffs have been called to come play because a particular machine is "hot." They also claim cash has been advanced by location owners to use in play of the machines. Each of these items may constitute a "special inducement." The last allegation may also support the debt-based RICO claim.

**49.** The court has the authority to extend the provisions of its injunction to persons who, because of their relationship with the party subject to the injunction, are considered in

privity with the party. 13 *Moore's Federal Practice* § 65.61[2]. In fact, Rule 65(d), Fed. R.Civ.P. provides that every order granting an injunction is binding "upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise."

**50.** The court has set forth its reasoning in this memorandum opinion and will issue its order in a separate document so as to facilitate the copying and dissemination of the order to all affected parties.

Administrative Law Judge Allison Lee. However, all its machines display and Pedroland redeems jackpots in amounts in excess of $125. It purports to have shown its employees a copy of the law, but it admits it has not provided them with any training or procedural guidelines relating to its asserted interpretation(s) of the law.

During deposition testimony, Pedroland's general manager first indicated an interpretation of the statute as allowing payments of "losses plus" $125. Confronted with evidence that other forms of payouts (discussed below) were made, he indicated alternative interpretations allowing for payment over a series of days or to proxies. Pedroland's officer admitted that players may receive a series of $125 tickets up to the total dollars displayed on the machines. These tickets may be redeemed in one of three ways:

a) all will be paid on a single day, upon the player's unverified statement that the amount does not exceed more than $125 over the amount deposited into the machine; or

b) all will be paid on a single day through proxies (*i.e.,* the player may distribute tickets to third persons who may then collect the winnings); or

c) all will be paid over a series of days in $125 installments until the total amount showing on the screen at the conclusion of play is received.

1. Some tickets delete the word "than."

There is no limit to the amount that can be won during any single 24 hour period and paid in the manner described above, though Pedroland "tries to keep it at $1000." Cooke depos. at 60.

Pedroland records presented to this court include numerous tickets printed sequentially for winnings on the same machine as a result of the same series of play. These tickets, together with its officer's testimony, demonstrate routine payments to players in excess of $125. Some of voucher tickets kept by Pedroland provide a statement and signature line to be signed by the player certifying that the player has not won more than $125. The relevant language does not refer to the payout as not exceeding losses by more than $125, as Pedroland claims to interpret the law, but instead reads simply: "I certify that I have not won more [than][1] $125 in the last 24 hours;" or "I have not collected over $125 in the past 24 hours." In any case, not one of the 59 tickets presented to this court had a signature. These 59 tickets represent six separate series of tickets with all but the last ticket in each series representing a payout of $125 (each series representing a single period of play). Thus, these six series of tickets represent six periods of play which resulted in average payouts exceeding $1000 each. Sample tickets are attached.

528

```
* U.S.GAMES,INC. VER:USG 352A/R352DRW2 *
TERM#000001 BANK#01

SILVER SLIPPER PB-80
SOUTH OF THE BORDER S.C. *****
LICENSE#8805 TERMINAL#4D8D BR#03 MXH0350

03:18:12 ** 01/05/99
TICKET#0006119 --- CREDIT VALUE = $0.05
** VOUCHER TICKET **
**BIG TIME DEUCES **

CRED: 2500 $ 125.00
***********ONE HUNDRED TWENTY***********
******FIVE DOLLARS AND NO CENTS*******

)) I CERTIFY THAT I HAVE NOT WON MORE ((
)) $125 IN THE LAST 24 HOURS ((
X

VOID IF MUTILATED VAL# 632E732E
*** COPYRIGHT 1986-96 U.S.GAMES,INC. ***
```

```
* U.S.GAMES,INC. VER:USG 352A/R352DRW2 *
TERM#000001 BANK#01

SILVER SLIPPER PB-80
SOUTH OF THE BORDER S.C. *****
LICENSE#8805 TERMINAL#4D8D BR#03 MXH0350

03:17:58 ** 01/05/99
TICKET#006126 --- CREDIT VALUE = $0.05
** VOUCHER TICKET **
**BIG TIME DEUCES **

CRED: 2500 $ 125.00
***********ONE HUNDRED TWENTY***********
******FIVE DOLLARS AND NO CENTS*******

)) I CERTIFY THAT I HAVE NOT WON MORE ((
)) $125 IN THE LAST 24 HOURS ((
X

VOID IF MUTILATED VAL# 87D3BC54
*** COPYRIGHT 1986-96 U.S.GAMES,INC. ***
```

```
* U.S.GAMES,INC. VER:USG 352A/R352DRW2 *
TERM#000001 BANK#01

SILVER SLIPPER PB-80
SOUTH OF THE BORDER S.C. *****
LICENSE#8805 TERMINAL#4D8D BR#03 MXH0350

03:18:36 ** 01/05/99
TICKET#0006121 --- CREDIT VALUE = $0.05
** VOUCHER TICKET **
**BIG TIME DEUCES **

CRED: 2500 $ 125.00
***********ONE HUNDRED TWENTY***********
******FIVE DOLLARS AND NO CENTS*******

)) I CERTIFY THAT I HAVE NOT WON MORE ((
)) $125 IN THE LAST 24 HOURS ((
X

VOID IF MUTILATED VAL# 9DB16360
*** COPYRIGHT 1986-96 U.S.GAMES,INC. ***
```

```
* U.S.GAMES,INC. VER:USG 352A/R352DRW2 *
TERM#000001 BANK#01

SILVER SLIPPER PB-80
SOUTH OF THE BORDER S.C. *****
LICENSE#8805 TERMINAL#4D8D BR#03 MXH0350

03:18:24 ** 01/05/99
TICKET#0006120 --- CREDIT VALUE = $0.05
** VOUCHER TICKET **
**BIG TIME DEUCES **

CRED: 2500 $ 125.00
***********ONE HUNDRED TWENTY***********
******FIVE DOLLARS AND NO CENTS*******

)) I CERTIFY THAT I HAVE NOT WON MORE ((
)) $125 IN THE LAST 24 HOURS ((
X

VOID IF MUTILATED VAL# 231E8E73
*** COPYRIGHT 1986-96 U.S.GAMES,INC. ***
```

```
* U.S.GAMES,INC. VER:USG 352A/R352DRW2 *
TERM#000001 BANK#01

SILVER SLIPPER PB-80
SOUTH OF THE BORDER S.C. *****
LICENSE#8805 TERMINAL#4D8D BR#03 MXH0350

03:19:00 ** 01/05/99
TICKET#0006123 --- CREDIT VALUE = $0.05
** VOUCHER TICKET **
**BIG TIME DEUCES **

CRED: 2500 $ 125.00
***********ONE HUNDRED TWENTY***********
******FIVE DOLLARS AND NO CENTS*******

)) I CERTIFY THAT I HAVE NOT WON MORE ((
)) $125 IN THE LAST 24 HOURS : ((
X

VOID IF MUTILATED VAL# F2B1CF58
*** COPYRIGHT 1986-96 U.S.GAMES,INC. ***
```

```
* U.S.GAMES,INC. VER:USG 352A/R352DRW2 *
TERM#000001 BANK#01

SILVER SLIPPER PB-80
SOUTH OF THE BORDER S.C. *****
LICENSE#8805 TERMINAL#4D8D BR#03 MXH0350

03:18:48 ** 01/05/99
TICKET#0006122 --- CREDIT VALUE = $0.05
** VOUCHER TICKET **
**BIG TIME DEUCES **

CRED: 2500 $ 125.00
***********ONE HUNDRED TWENTY***********
******FIVE DOLLARS AND NO CENTS*******

)) I CERTIFY THAT I HAVE NOT WON MORE ((
)) $125 IN THE LAST 24 HOURS ((
X

VOID IF MUTILATED VAL# 42EC0533
*** COPYRIGHT 1986-96 U.S.GAMES,INC. ***
```

A-3

SILVER SLIPPER
BJ-5

CASH OUT
Date: 01.07.99 Time: 16:14 am
Ticket#: 28453

PLAYER 3
CREDITS: 2500

========================================

** $125.00 **

========================================
/805/5/1754/203 71

X_____
I have not collected over $125 in the
past 24 hours.

THANK YOU FOR PLAYING
VR BLACKJACK

SILVER SLIPPER
BJ-5

CASH OUT
Date: 01/07/99 Time: 16:14 am
Ticket#: 28458

PLAYER 3
CREDITS: 2500

========================================

** $125.00 **

========================================
/805/5/1754/203 71

X_____
I have not collected over $125 in the
past 24 hours.

THANK YOU FOR PLAYING
VR BLACKJACK

SILVER SLIPPER
BJ-5

CASH OUT
Date: 01/07/99 Time: 16:14 am
Ticket#: 28441

PLAYER 3
CREDITS: 2500

========================================

** $125.00 **

========================================
/805/5/1754/203 71

X_____
I have not collected over $125 in the
past 24 hours.

A-4

SILVER SLIPPER
BJ-5

CASH OUT
Date: 01/07/99 Time: 16:12 am
Ticket#: 28440

PLAYER 3
CREDITS: 2500

========================================

** $125.00 **

========================================
/805/5/1754/203 71

X_____
I have not collected over $125 in the
past 24 hours.

## R.L. Jordan Oil Company of North Carolina

R.L. Jordan Oil Company of North Carolina acknowledges that this court held in a preliminary ruling that the legal payout limit is $125 regardless of the money deposited. It is at least on notice of the same interpretation by DOR and Administrative Law Judge Allison Lee. However, all of its machines display and Jordan redeems jackpots in amounts in excess of $125. It admits consciously abandoning its former compliance with the $125 limit because its non-compliant competitors were luring away its business.

Jordan players are routinely paid amounts up to $1,125 within a 24 hour period, as long as they sign a document (discussed below). Jordan believes if it pays out less than $1,200, it can avoid federal reporting requirements. It chose a $1,125 limit (*i.e.,* 9 tickets of $125 each) as an easily manageable means of keeping payouts below this level per day. A player may, however, return on subsequent days to collect additional winnings greater than $1,125. Jordan also allows a player's friends to act as proxies in receiving winnings.

Jordan created a "Receipt, Release, Acknowledgement and Trust Agreement," which provides:

> Although, at first glance, it might appear that the cash payment received by the undersigned exceeds One Hundred and Twenty–Five Dollars ($125.00), in violation of the law, in fact, the undersigned hereby certifies and affirms that after first deducting the amount of the money he/she invested (deposited in one or more Jordan Oil coin-operated machines) in order to obtain the cash payout referred to herein, the amount involved is, in fact, less than One Hundred and Twenty–Five Dollars ($125.00). In the alternative, if in fact the amount received by the undersigned exceeds One Hundred and Twenty–Five Dollars ($125.00), over and above the amount of his/her investment, the undersigned hereby agrees to hold any excess money over and above that amount in trust, and to release it to himself/herself, periodically, at a rate not to exceed One Hundred and Twenty–Five Dollars per day, so as to ensure that both the undersigned and Jordan Oil are in full compliance with the law set forth above.

Sample "Receipt" attached. Players may also be asked to sign the payout tickets printed by the machine. Samples attached.

Jordan maintains that if a player who has winnings in excess of $125 refuses to sign this document, he may only collect $125 of his winnings. Jordan does not have an independent method with which to verify players' statements or promises.

Although not appropriate for purposes of granting summary judgment, the court notes the curiously striking resemblance in handwriting on the four sets of agreements presented to the court and their 34 corresponding voucher tickets provided to plaintiffs by the defendants. None of the agreements was witnessed or dated, although the agreement provided spaces for this information.

At the April 19, 1999 hearing, counsel for Jordan could offer no rationale for this internally inconsistent "Receipt, Release, Acknowledgement and Trust Agreement" with its legally defective trust. He did, however, indicate that it was not drafted by counsel.

STATE OF SOUTH CAROLINA ) RECEIPT, RELEASE,
 ) ACKNOWLEDGEMENT AND TRUST
COUNTY OF ) AGREEMENT

The undersigned hereby acknowledges having received from R. L. Jordan Oil Company of North Carolina, Inc. ("Jordan Oil"), a "cash payout", as referred to in Section 12-21-2791 of the Code of Laws of South Carolina, 1976, as amended, from a Jordan Oil coin-operated machine location located at _2701_ _(Coopers)_, South Carolina, as of the date set forth below. Although, at first glance, it might appear that the cash payment received by the undersigned exceeds One Hundred and Twenty-Five Dollars ($125.00), in violation of the law, in fact, the undersigned hereby certifies and affirms that after first deducting the amount of the money he/she invested (deposited in one or more Jordan Oil coin-operated machines) in order to obtain the cash payout referred to herein, the amount involved is, in fact, less than One Hundred Twenty-Five Dollars ($125.00). In the alternative, if in fact the amount received by the undersigned exceeds One Hundred and Twenty-Five Dollars ($125.00), over and above the amount of his/her investment, the undersigned hereby agrees to hold any excess money over and above that amount in trust, and to release it to himself/herself, periodically, at a rate not to exceed One Hundred and Twenty-Five Dollars per day, so as to ensure that both the undersigned and Jordan Oil are in full compliance with the law set forth above.

The within agreement shall be binding upon the undersigned and upon the undersigned's heirs and assigns.

Dated this _____ day of _____, 199 ___.

 _Buck Massey_
WITNESSES: 0023456
 2/4/42
_____

_____ A-7

```
POT-O-GOLD VER:POS 371C/R371DRV1
TERM#000001 BANK#01

BARBARY COAST
**** VALID AT THIS LOCATION ONLY! ****
LICENSE#A65 TERMINAL#7791 BANK3 MN#8371

07:58:34 ** 04/15/98
TICKET#000741 — CREDIT VALUE = 48.65
** VOUCHER TICKET **
**TOUCHEASY KENO **

CRED: 2500 $ 125.00
********ONE HUNDRED TWENTYN********
********FIVE DOLLARS AND NO CENTS********
X
>> I CERTIFY THAT I HAVE NOT WON MORE <<
>> THAN $125 IN THE LAST 24 HOURS <<
VAL# D049973
VOID IF MUTILATED
* COPYRIGHT 1986-97 LEISURE TIME TECH. *
```

```
POT-O-GOLD VER:POS 371C/R371DRV1
TERM#000001 BANK#01

BARBARY COAST
**** VALID AT THIS LOCATION ONLY! ****
LICENSE#A65 TERMINAL#7791 BANK3 MN#8371

07:58:41 ** 04/15/98
TICKET#000775 — CREDIT VALUE = 48.65
** VOUCHER TICKET **
**TOUCHEASY KENO **

CRED: 2500 $ 125.00
********ONE HUNDRED TWENTYN********
********FIVE DOLLARS AND NO CENTS********
X
>> I CERTIFY THAT I HAVE NOT WON MORE <<
>> THAN $125 IN THE LAST 24 HOURS <<
VAL# C4827AB
VOID IF MUTILATED
* COPYRIGHT 1986-97 LEISURE TIME TECH. *
```

```
POT-O-GOLD VER:POS 371C/R371DRV1
TERM#000001 BANK#01

BARBARY COAST
**** VALID AT THIS LOCATION ONLY! ****
LICENSE#A65 TERMINAL#7791 BANK3 MN#8371

07:57:44 ** 04/15/98
TICKET#000978 — CREDIT VALUE = 48.65
** VOUCHER TICKET **
**TOUCHEASY KENO **

CRED: 2500 $ 125.00
********ONE HUNDRED TWENTYN********
********FIVE DOLLARS AND NO CENTS********
X
>> I CERTIFY THAT I HAVE NOT WON MORE <<
>> THAN $125 IN THE LAST 24 HOURS <<
VAL# D825KF59
VOID IF MUTILATED
* COPYRIGHT 1986-97 LEISURE TIME TECH. *
```

```
POT-O-GOLD VER:POS 371C/R371DRV1
TERM#000001 BANK#01

BARBARY COAST
**** VALID AT THIS LOCATION ONLY! ****
LICENSE#A65 TERMINAL#7709 BANK3 MN#8371

07:57:16 ** 04/15/98
TICKET#000776 — CREDIT VALUE = 48.65
** VOUCHER TICKET **
**TOUCHEASY KENO **

CRED: 2500 $ 125.00
********ONE HUNDRED TWENTYN********
********FIVE DOLLARS AND NO CENTS********
X
>> I CERTIFY THAT I HAVE NOT WON MORE <<
>> THAN $125 IN THE LAST 24 HOURS <<
VAL# 9503END6
VOID IF MUTILATED
* COPYRIGHT 1986-97 LEISURE TIME TECH. *
```

```
POT-O-GOLD VER:POS 371C/R371DRV1
TERM#000001 BANK#01

BARBARY COAST
**** VALID AT THIS LOCATION ONLY! ****
LICENSE#A65 TERMINAL#7709 BANK3 MN#8371

07:58:20 ** 04/15/98
TICKET#000778 — CREDIT VALUE = 48.65
** VOUCHER TICKET **
**TOUCHEASY KENO **

CRED: 2500 $ 125.00
********ONE HUNDRED TWENTYN********
********FIVE DOLLARS AND NO CENTS********
X
>> I CERTIFY THAT I HAVE NOT WON MORE <<
>> THAN $125 IN THE LAST 24 HOURS <<
VAL# 8157631
VOID IF MUTILATED
* COPYRIGHT 1986-97 LEISURE TIME TECH. *
```

```
POT-O-GOLD VER:POS 371C/R371DRV1
TERM#000001 BANK#01

BARBARY COAST
**** VALID AT THIS LOCATION ONLY! ****
LICENSE#A65 TERMINAL#7709 BANK3 MN#8371

07:57:28 ** 04/15/98
TICKET#000777 — CREDIT VALUE = 48.65
** VOUCHER TICKET **
**TOUCHEASY KENO **

CRED: 2500 $ 125.00
********ONE HUNDRED TWENTYN********
********FIVE DOLLARS AND NO CENTS********
X
>> I CERTIFY THAT I HAVE NOT WON MORE <<
>> THAN $125 IN THE LAST 24 HOURS <<
VOID IF MUTILATED
* COPYRIGHT 1986-97 LEISURE TIME TECH. *
```

A-10

STATE OF SOUTH CAROLINA ) RECEIPT, RELEASE,
) ACKNOWLEDGEMENT AND TRUST
COUNTY OF ) AGREEMENT

The undersigned hereby acknowledges having received from R. L. Jordan Oil Company of North Carolina, Inc. ("Jordan Oil"), a "cash payout", as referred to in Section 12-21-2791 of the Code of Laws of South Carolina, 1976, as amended, from a Jordan Oil coin-operated machine location located at _2701 (Coopers)_, South Carolina, as of the date set forth below. Although, at first glance, it might appear that the cash payment received by the undersigned exceeds One Hundred and Twenty-Five Dollars ($125.00), in violation of the law, in fact, the undersigned hereby certifies and affirms that after first deducting the amount of the money he/she invested (deposited in one or more Jordan Oil coin-operated machines) in order to obtain the cash payout referred to herein, the amount involved is, in fact, less than One Hundred Twenty-Five Dollars ($125.00). In the alternative, if in fact the amount received by the undersigned exceeds One Hundred and Twenty-Five Dollars ($125.00), over and above the amount of his/her investment, the undersigned hereby agrees to hold any excess money over and above that amount in trust, and to release it to himself/herself, periodically, at a rate not to exceed One Hundred and Twenty-Five Dollars per day, so as to ensure that both the undersigned and Jordan Oil are in full compliance with the law set forth above.

The within agreement shall be binding upon the undersigned and upon the undersigned's heirs and assigns.

Dated this _____ day of _____, 199 ___.

WITNESSES:

_____

_____

_Billy Pattom_
0032147
8/5/48

A-9

A-8

STATE OF SOUTH CAROLINA ) **RECEIPT, RELEASE,**

 ) **ACKNOWLEDGEMENT AND TRUST**

COUNTY OF ) **AGREEMENT**

 The undersigned hereby acknowledges having received from R. L. Jordan Oil Company of North Carolina, Inc. ("Jordan Oil"), a "cash payout", as referred to in Section 12-21-2791 of the Code of Laws of South Carolina, 1976, as amended, from a Jordan Oil coin-operated machine location located at _2701 Cowpens_ , South Carolina, as of the date set forth below. Although, at first glance, it might appear that the cash payment received by the undersigned exceeds One Hundred and Twenty-Five Dollars ($125.00), in violation of the law, in fact, the undersigned hereby certifies and affirms that after first deducting the amount of the money he/she invested (deposited in one or more Jordan Oil coin-operated machines) in order to obtain the cash payout referred to herein, the amount involved is, in fact, less than One Hundred Twenty-Five Dollars. ($125.00). In the alternative, if in fact the amount received by the undersigned exceeds One Hundred and Twenty-Five Dollars ($125.00), over and above the amount of his/her investment, the undersigned hereby agrees to hold any excess money over and above that amount in trust, and to release it to himself/herself, periodically, at a rate not to exceed One Hundred and Twenty-Five Dollars per day, so as to ensure that both the undersigned and Jordan Oil are in full compliance with the law set forth above.

 The within agreement shall be binding upon the undersigned and upon the undersigned's heirs and assigns.

Dated this _____ day of _____, 199 ___.

WITNESSES:

_____

_____

_Debbie Skates_

00523 41

5/5/68

A-11

BARBARY COAST
### POT-O-GOLD VER:POG.371C/R371RN1 ###
### TERM#00001 BANK#01

#### VALID AT THIS LOCATION ONLY! ####
LICENSE#0074 TERMINAL#7799 BANK3 RK#0371
07:05:58 ** 04/15/98
TICKET#00074 — CREDIT VALUE: $0.05
** VOUCHER TICKET **
** TOUCHEASY KENO **
##############################
CRED: 2500 $ 125.00
*****ONE HUNDRED TWENTY*****
*****FIVE DOLLARS AND NO CENTS*****
>> I CERTIFY THAT I HAVE NOT WON MORE <<
>> THAN $125 IN THE LAST 24 HOURS <<
X
VALID R7743AC7
* VOID IF MUTILATED
* COPYRIGHT 1986-97 LEISURE TIME TECH. *

BARBARY COAST
### POT-O-GOLD VER:POG.371C/R371RN1 ###
### TERM#00001 BANK#01

#### VALID AT THIS LOCATION ONLY! ####
LICENSE#0075 TERMINAL#7799 BANK3 RK#0371
07:04:34 ** 04/15/98
TICKET#00075 — CREDIT VALUE: $0.05
** VOUCHER TICKET **
** TOUCHEASY KENO **
##############################
CRED: 2500 $ 125.00
*****ONE HUNDRED TWENTY*****
*****FIVE DOLLARS AND NO CENTS*****
>> I CERTIFY THAT I HAVE NOT WON MORE <<
>> THAN $125 IN THE LAST 24 HOURS <<
X
VALID R328A162
* VOID IF MUTILATED
* COPYRIGHT 1986-97 LEISURE TIME TECH. *

BARBARY COAST
### POT-O-GOLD VER:POG.371C/R371RN1 ###
### TERM#00001 BANK#01

#### VALID AT THIS LOCATION ONLY! ####
LICENSE#0076 TERMINAL#7799 BANK3 RK#0371
07:05:20 ** 04/15/98
TICKET#00076 — CREDIT VALUE: $0.05
** VOUCHER TICKET **
** TOUCHEASY KENO **
##############################
CRED: 2500 $ 125.00
*****ONE HUNDRED TWENTY*****
*****FIVE DOLLARS AND NO CENTS*****
>> I CERTIFY THAT I HAVE NOT WON MORE <<
>> THAN $125 IN THE LAST 24 HOURS <<
X
VALID R3A1638
* VOID IF MUTILATED
* COPYRIGHT 1986-97 LEISURE TIME TECH. *

BARBARY COAST
### POT-O-GOLD VER:POG.371C/R371RN1 ###
### TERM#00001 BANK#01

#### VALID AT THIS LOCATION ONLY! ####
LICENSE#0073 TERMINAL#7799 BANK3 RK#0371
07:04:52 ** 04/15/98
TICKET#00073 — CREDIT VALUE: $0.05
** VOUCHER TICKET **
** TOUCHEASY KENO **
##############################
CRED: 2500 $ 125.00
*****ONE HUNDRED TWENTY*****
*****FIVE DOLLARS AND NO CENTS*****
>> I CERTIFY THAT I HAVE NOT WON MORE <<
>> THAN $125 IN THE LAST 24 HOURS <<
X
VALID R59090
* VOID IF MUTILATED
* COPYRIGHT 1986-97 LEISURE TIME TECH. *

BARBARY COAST
### POT-O-GOLD VER:POG.371C/R371RN1 ###
### TERM#00001 BANK#01

#### VALID AT THIS LOCATION ONLY! ####
LICENSE#0085 TERMINAL#7799 BANK3 RK#0371
07:04:16 ** 04/15/98
TICKET#00073 — CREDIT VALUE: $0.05
** VOUCHER TICKET **
** TOUCHEASY KENO **
##############################
CRED: 2500 $ 125.00
*****ONE HUNDRED TWENTY*****
*****FIVE DOLLARS AND NO CENTS*****
>> I CERTIFY THAT I HAVE NOT WON MORE <<
>> THAN $125 IN THE LAST 24 HOURS <<
X
VALID G4796650
* VOID IF MUTILATED
* COPYRIGHT 1986-97 LEISURE TIME TECH. *

A-12

STATE OF SOUTH CAROLINA ) RECEIPT, RELEASE,

 ) ACKNOWLEDGEMENT AND TRUST

COUNTY OF ) AGREEMENT

The undersigned hereby acknowledges having received from R. L. Jordan Oil Company of North Carolina, Inc. ("Jordan Oil"), a "cash payout", as referred to in Section 12-21-2791 of the Code of Laws of South Carolina, 1976, as amended, from a Jordan Oil coin-operated machine location located at _2701_ _____Carpers_____, South Carolina, as of the date set forth below. Although, at first glance, it might appear that the cash payment received by the undersigned exceeds One Hundred and Twenty-Five Dollars ($125.00), in violation of the law, in fact, the undersigned hereby certifies and affirms that after first deducting the amount of the money he/she invested (deposited in one or more Jordan Oil coin-operated machines) in order to obtain the cash payout referred to herein, the amount involved is, in fact, less than One Hundred Twenty-Five Dollars ($125.00). In the alternative, if in fact the amount received by the undersigned exceeds One Hundred and Twenty-Five Dollars ($125.00), over and above the amount of his/her investment, the undersigned hereby agrees to hold any excess money over and above that amount in trust, and to release it to himself/herself, periodically, at a rate not to exceed One Hundred and Twenty-Five Dollars per day, so as to ensure that both the undersigned and Jordan Oil are in full compliance with the law set forth above.

The within agreement shall be binding upon the undersigned and upon the undersigned's heirs and assigns.

Dated this _____ day of _____, 199 ___.

WITNESSES:

_____

_____

_Roger Warren_

_0087642_

_4-2-54_

_A-13_

A-14

## MHS Enterprises, Inc.

MHS takes the position that the legal payout limit is $125 over the amount of money deposited. It is at least on notice of this court's preliminary ruling that this is not the proper interpretation and similar interpretations by DOR and Administrative Law Judge Allison Lee. It admits it provides no manual or training to employees as to its interpretation of the payout limit. According to the testimony of MHS owner, Stacks, "they have no limit." Its machines display and it redeems jackpots in amounts in excess of $125.

Upon the presentation of multiple tickets by a player, MHS routinely pays amounts greater than $125, without limit, within a 24–hour period. MHS admits that it does not make any federal reporting disclosures for payouts it makes greater than $1,200. It does not use any kind of separate document such as a release or affidavit. Its voucher tickets and cash out receipts contain a statement and signature line to be signed by the player certifying that he has not won more than $125.

Stacks testified that no representation whatsoever must be made by players to receive payment. None of the 136 tickets attached to the MHS deposition was signed with a legible name or signature; and if marked at all had indicated "x's" on the signature line or scribbles and numbers below the signature line.

540

**Receipt 1**

```
3****************
** CADILLAC CLUB *
** COLUMBIA, SC *
** BROAD RIVER RD.*
*****************
12/29/1998 14:41:39

25000 X 00.05
= $125.00

ONE HUNDRED AND
TWENTY FIVE AND
00/100

MACHINE #0004
SERIAL #0006
SECURITY #034474

TICKET #73455

 3867355B3474

!! I CERTIFY THAT I HAVE NOT WON MORE !!
!! THAN $125 IN THE LAST 24 HOURS !!

X
------------- END -------------
```

**Receipt 2**

```
3****************
** CADILLAC CLUB *
** COLUMBIA, SC *
** BROAD RIVER RD.*
*****************
12/29/1998 14:42:10

25000 X 00.05
= $125.00

ONE HUNDRED AND
TWENTY FIVE AND
00/100

MACHINE #0004
SERIAL #0006
SECURITY #43941

TICKET #73456

 3867355B43941

!! I CERTIFY THAT I HAVE NOT WON MORE !!
!! THAN $125 IN THE LAST 24 HOURS !!

X
------------- END -------------
```

**Receipt 3**

```
****************
* CADILLAC CLUB *
* COLUMBIA, SC *
* BROAD RIVER RD.*
*****************
12/29/1998 14:42:42

25000 X 00.05
= $125.00

ONE HUNDRED AND
TWENTY FIVE AND
00/100

MACHINE #0004
SERIAL #0006
SECURITY #42271

TICKET #73457

 3867374271

!! I CERTIFY THAT I HAVE NOT WON MORE !!
!! THAN $125 IN THE LAST 24 HOURS !!

X
------------- END -------------
```

A-16

```
* U.S.GAMES.INC. VER:POG 371B/R371DRW1 *
TERM#000001 BANK#01

<TREASURE ISLAND #4>
***** VALID AT THIS LOCATION ONLY! *****
LICENSE#8885 TERMINAL#540E 5R#03 RX#0378

12:45:40 ** 12/09/98
TICKET#00006876 --- CREDIT VALUE = $0.05
** VOUCHER TICKET **
** SHAMROCK 7'S **

CRED: 2500 $ 125.00
**********ONE HUNDRED TWENTY**********
******FIVE DOLLARS AND NO CENTS*******

)) I CERTIFY THAT I HAVE NOT WON MORE ((
)) THAN $125 IN THE LAST 24 HOURS ((
X

VOID IF MUTILATED VAL# 93328462
*** COPYRIGHT 1986-96 U.S.GAMES.INC. ***
```

```
* U.S.GAMES.INC. VER:POG 371B/R371DRW1 *
TERM#000001 BANK#01

<TREASURE ISLAND #4>
***** VALID AT THIS LOCATION ONLY! *****
LICENSE#8885 TERMINAL#540E BR#03 RX#0378

12:45:54 ** 12/09/98
TICKET#00006877 --- CREDIT VALUE = $0.05
** VOUCHER TICKET **
** SHAMROCK 7'S **

CRED: 2500 $ 125.00
**********ONE HUNDRED TWENTY**********
******FIVE DOLLARS AND NO CENTS*******

)) I CERTIFY THAT I HAVE NOT WON MORE ((
)) THAN $125 IN THE LAST 24 HOURS ((
X

VOID IF MUTILATED VAL# 99E3A86L
*** COPYRIGHT 1986-96 U.S.GAMES.INC. ***
```

```
* U.S.GAMES.INC. VER:POG 371B/R371DRW1 *
TERM#000001 BANK#01

<TREASURE ISLAND #4>
***** VALID AT THIS LOCATION ONLY! *****
LICENSE#8885 TERMINAL#540E 3R#03 RX#0378

12:45:14 ** 12/09/98
TICKET#00006874 --- CREDIT VALUE = $0.05
** VOUCHER TICKET **
** SHAMROCK 7'S **

CRED: 2500 $ 125.00
**********ONE HUNDRED TWENTY**********
******FIVE DOLLARS AND NO CENTS*******

)) I CERTIFY THAT I HAVE NOT WON MORE ((
)) THAN $125 IN THE LAST 24 HOURS ((
X

VOID IF MUTILATED VAL# 62786699
*** COPYRIGHT 1986-96 U.S.GAMES.INC. ***
```

```
* U.S.GAMES.INC. VER:POG 371B/R371DRW1 *
TERM#000001 BANK#01

<TREASURE ISLAND #4>
***** VALID AT THIS LOCATION ONLY! *****
LICENSE#8885 TERMINAL#540E 3R#03 RX#0378

12:45:26 ** 12/09/98
TICKET#00006875 --- CREDIT VALUE = $0.05
** VOUCHER TICKET **
** SHAMROCK 7'S **

CRED: 2500 $ 125.00
**********ONE HUNDRED TWENTY**********
******FIVE DOLLARS AND NO CENTS*******

)) I CERTIFY THAT I HAVE NOT WON MORE ((
)) THAN $125 IN THE LAST 24 HOURS ((
X

VOID IF MUTILATED VAL# 85780962
*** COPYRIGHT 1986-96 U.S.GAMES.INC. ***
```

```
* U.S.GAMES.INC. VER:POG 371B/R371DRW1 *
TERM#000001 BANK#01

<TREASURE ISLAND #4>
***** VALID AT THIS LOCATION ONLY! *****
LICENSE#8885 TERMINAL#540E BR#03 RX#0378

12:44:48 ** 12/09/98
TICKET#00006872 --- CREDIT VALUE = $0.05
** VOUCHER TICKET **
** SHAMROCK 7'S **

CRED: 2500 $ 125.00
**********ONE HUNDRED TWENTY**********
******FIVE DOLLARS AND NO CENTS*******

)) I CERTIFY THAT I HAVE NOT WON MORE ((
)) THAN $125 IN THE LAST 24 HOURS ((
X

VOID IF MUTILATED VAL# 7CCF9CC6
*** COPYRIGHT 1986-96 U.S.GAMES.INC. ***
```

```
* U.S.GAMES.INC. VER:POG 371B/R371DRW1 *
TERM#000001 BANK#01

<TREASURE ISLAND #4>
***** VALID AT THIS LOCATION ONLY! *****
LICENSE#8885 TERMINAL#540E BR#03 RX#0378

12:45:00 ** 12/09/98
TICKET#00006873 --- CREDIT VALUE = $0.05
** VOUCHER TICKET **
** SHAMROCK 7'S **

CRED: 2500 $ 125.00
**********ONE HUNDRED TWENTY**********
******FIVE DOLLARS AND NO CENTS*******

)) I CERTIFY THAT I HAVE NOT WON MORE ((
)) THAN $125 IN THE LAST 24 HOURS ((
X

VOID IF MUTILATED VAL# F3E2904:
*** COPYRIGHT 1986-96 U.S.GAMES.INC. ***
```

A-17

```
*** POT-O-GOLD VER:POG_371C/R371DRW1 ***
TERM#000001 BANK#01

VICTORS#5
***** VALID AT THIS LOCATION ONLY! *****
LICENSE#8805 TERMINAL#6F2F BR#03 MK#0371

15:25:32 ** 12/12/98
TICKET#00003215 --- CREDIT VALUE = $0.05
** VOUCHER TICKET **
**SUPERGOLD BINGO **

CRED: 2500 / $ 125.00
**********ONE HUNDRED TWENTY**********
*******FIVE DOLLARS AND NO CENTS********

)) I CERTIFY THAT I HAVE NOT WON MORE ((
)) THAN $125 IN THE LAST 24 HOURS ((
X

VOID IF MUTILATED VAL# EA209491
* COPYRIGHT 1986-97 LEISURE TIME TECH. *
```

```
*** POT-O-GOLD VER:POG_371C/R371DRW1 ***
TERM#000001 BANK#01

VICTORS#5
***** VALID AT THIS LOCATION ONLY! *****
LICENSE#8805 TERMINAL#6F2F BR#03 MK#0371

15:25:44 ** 12/12/98
TICKET#00003216 --- CREDIT VALUE = $0.05
** VOUCHER TICKET **
**SUPERGOLD BINGO **

CRED: 2500 $/125.00
**********ONE HUNDRED TWENTY**********
*****FIVE DOLLARS AND NO CENTS********

)) I CERTIFY THAT I HAVE NOT WON MORE ((
)) THAN $125 IN THE LAST 24 HOURS ((
X

VOID IF MUTILATED VAL# ECCE8C76
* COPYRIGHT 1986-97 LEISURE TIME TECH. *
```

```
*** POT-O-GOLD VER:POG_371C/R371DRW1 ***
TERM#000001 BANK#01

VICTORS#5
***** VALID AT THIS LOCATION ONLY! *****
LICENSE#8805 TERMINAL#6F2F BR#03 MK#0371

15:25:08 ** 12/12/98
TICKET#00003213 --- CREDIT VALUE = $0.05
** VOUCHER TICKET **
**SUPERGOLD BINGO **

CRED: 2500 $ 125.00
**********ONE HUNDRED TWENTY**********
******FIVE DOLLARS AND NO CENTS*******

)) I CERTIFY THAT I HAVE NOT WON MORE ((
)) THAN $125 IN THE LAST 24 HOURS ((
X

VOID IF MUTILATED VAL# 0DC92523
* COPYRIGHT 1986-97 LEISURE TIME TECH. *
```

```
*** POT-O-GOLD VER:POG_371C/R371DRW1 ***
TERM#000001 BANK#01

VICTORS#5
***** VALID AT THIS LOCATION ONLY! *****
LICENSE#8805 TERMINAL#6F2F BR#03 MK#0371

15:25:20 ** 12/12/98
TICKET#00003214 --- CREDIT VALUE = $0.05
** VOUCHER TICKET **
**SUPERGOLD BINGO **

CRED: 2500 $/125.00
**********ONE HUNDRED TWENTY**********
******FIVE DOLLARS AND NO CENTS*******

)) I CERTIFY THAT I HAVE NOT WON MORE ((
)) THAN $125 IN THE LAST 24 HOURS ((
X

VOID IF MUTILATED VAL# 148CF73D
* COPYRIGHT 1986-97 LEISURE TIME TECH. *
```

A-18

```
3************************
* CADILLAC CLUB *
** COLUMBIA, SC *
** BROAD RIVER RD. *
*************************
12/29/1998 13:42:16

 2500 X 00.05
 = $125.00

ONE HUNDRED AND
TWENTY FIVE AND
 00/100

MACHINE #00004
SERIAL #00006
SECURITY #008649

TICKET #73552

3B6735288609

!! I CERTIFY THAT I HAVE NOT WON MORE !!
!! THAN $125 IN THE LAST 24 HOURS !!

X
------------------- END -------------------
```

```
3************************
** CADILLAC CLUB *
** COLUMBIA, SC *
** BROAD RIVER RD. *
*************************
12/29/1998 14:56:49

 2500 X 00.05
 = $125.00

ONE HUNDRED AND
TWENTY FIVE AND
 00/100

MACHINE #00003
SERIAL #00006
SECURITY #17373

TICKET #0297

3B6029717373

!! I CERTIFY THAT I HAVE NOT WON MORE !!
!! THAN $125 IN THE LAST 24 HOURS !!

X
------------------- END -------------------
```

```
3************************
** CADILLAC CLUB *
** COLUMBIA, SC *
** BROAD RIVER RD. *
*************************
12/29/1998 13:01:08

 2500 X 00.05
 = $125.00

ONE HUNDRED AND
TWENTY FIVE AND
 00/100

MACHINE #00005
SERIAL #00006
SECURITY #20448

TICKET #52017

!! I CERTIFY THAT I HAVE NOT WON MORE !!
!! THAN $125 IN THE LAST 24 HOURS !!

------------------- END -------------------
```

A-19

1000

```
*** POT-O-GOLD VER:POG_371C/R371DRW1 ***
TERM#000001 BANK#01

DAVES#5 *****

LICENSE#8805 TERMINAL#6A1A BR#03 MK#0371
>> DATE: 12/31/98 <<
TICKET#000004017 --- CREDIT VALUE = $0.05
** VOUCHER TICKET **
**SUPERBALL KENO **

CRED: 640 $ 32.00
************THIRTY TWO**************
*********DOLLARS AND NO CENTS*********

>) I CERTIFY THAT I HAVE NOT WON MORE ((
)) THAN $125 IN THE LAST 24 HOURS ((
X
VOID IF MUTILATED VAL# CCE66138
* COPYRIGHT 1986-97 LEISURE TIME TECH.
```

```
*** POT-O-GOLD VER:POG_371C/R371DRW1 ***
TERM#000001 BANK#01

DAVES#5 *****

LICENSE#8805 TERMINAL#6A1A BR#03 MK#0371
>> DATE: 12/31/98 <<
TICKET#000004016 --- CREDIT VALUE = $0.05
** VOUCHER TICKET **
**SUPERBALL KENO **

CRED: 2500 $ 125.00
***********ONE HUNDRED TWENTY**********
******FIVE DOLLARS AND NO CENTS*******

>) I CERTIFY THAT I HAVE NOT WON MORE ((
)) THAN $125 IN THE LAST 24 HOURS ((
X
VOID IF MUTILATED VAL# 00ABE782
* COPYRIGHT 1986-97 LEISURE TIME TECH.
```

```
*** POT-O-GOLD VER:POG_371C/R371DRW1 ***
TERM#000001 BANK#01

DAVES#5 *****

LICENSE#8805 TERMINAL#6A1A BR#03 MK#0371
>> DATE: 12/31/98 <<
TICKET#000004014 --- CREDIT VALUE = $0.05
** VOUCHER TICKET **
**SUPERBALL KENO **

CRED: 700 $ 35.00
***************THIRTY FIVE*************
*********DOLLARS AND NO CENTS*********

>) I CERTIFY THAT I HAVE NOT WON MORE ((
)) THAN $125 IN THE LAST 24 HOURS ((
X
VOID IF MUTILATED VAL# D089D4CD
* COPYRIGHT 1986-97 LEISURE TIME TECH. *
```

```
*** POT-O-GOLD VER:POG_371C/R371DRW1 ***
TERM#000001 BANK#01

DAVES#5 *****

LICENSE#8805 TERMINAL#6A1A BR#03 MK#0371
>> DATE: 12/31/98 <<
TICKET#000004015 --- CREDIT VALUE = $0.05
** VOUCHER TICKET **
**SUPERBALL KENO **

CRED: 1000 $ 50.00
****************FIFTY*****************
*********DOLLARS AND NO CENTS*********

>) I CERTIFY THAT I HAVE NOT WON MORE ((
)) THAN $125 IN THE LAST 24 HOURS ((
X
VOID IF MUTILATED -·VAL# D7BD1882
* COPYRIGHT 1986-97 LEISURE TIME TECH. *
```

A-20

## Ingram Investments, Inc.

Ingram Investments, Inc. acknowledges that this court held in a preliminary ruling that the legal payout limit is $125 regardless of the money deposited. It is at least on notice of the same interpretation by DOR and Administrative Law Judge Allison Lee. All its machines, however, display and Ingram redeems jackpots in amounts in excess of $125. Ingram claims that the locations are "supposed to have been instructed" that they cannot pay over "$125 over what somebody wins," (possibly meaning to say "loses")[2] although it provides no training or other type of communication to its employees of its "losses plus" interpretation of the law. Ingram depos. at 51.

Ingram does not have an independent method for determining the amounts deposited and relies solely on the customer's word. Ingram states that it pays its players the amount the payout tickets indicate as long as the players sign the payout tickets or a separate certification. The certification states:

> I hereby certify that I have not received a cash payout for credits earned for free games in excess of $125.00 at this location within the preceding 24-hour period. And funds I have received over $125.00 I hereby acknowledge under South Carolina Code 32-1-20.

Besides being inconsistent on its face, the code section referenced in this statement is the section that provides third parties the right to recover gambling losses.[3] It is unclear to this court what possible significance this could have to "acknowledging" receipt of funds in excess of $125.

Although not appropriate for purposes of summary judgment, the court notes that some copies of the certification provided to it reveal unusual similarities in "signatures"[4] of different players' names and that of the room attendant. Others contain only illegible scribbles and initials. The record also contains numerous unsigned payout tickets.

---

2. He later stated that they "can't pay over $125 ... you can't win over $125." Ingram Depos. at 52. *See also* Ingram depos. at 65–67 (cannot receive payout of $1,000 unless put in $875).

3. S.C.Code Ann. § 32-1-20 provides:
In case any person who shall lose such money or other thing as aforesaid shall not, within the time aforesaid, really and bona fide and without covin or collusion sue and with effect prosecute for the money or other things so by him or them lost and paid and delivered as aforesaid, it shall be lawful for any other person, by any such action or suit as aforesaid, to sue for and recover the same and treble the value thereof, with costs of suit, against such winner or winners as aforesaid, the one moiety thereof to the use of the person that will sue for the same and the other moiety to the use of the county in which the offense shall have been committed.

4. The "signatures" on the certification consist only of first names.

I HEREBY CERTIFY THAT I HAVE NOT RECEIVED A CASH PAYOUT POF CREDITS EA EARNED FOR FREE GAMES IN EXCESS OF ¥125.00 AT THIS LOCATION WITHIN THE PRECEDING 24-HOUR PERIOD. AND FUNDS I HAVE RECEIVED OVER $125.00 I HEREBY ACKNOWLEDGE UNDER SOUTH CAROLINA CODE 32-1-20.

LOCATION _East_ DATE _11-17-98_

SHIFT _1st_ ROOM ATTENDENT INITIAL

| 1 | 2 | 3 | 4 | 5 | SIGNATURE | |
|---|---|---|---|---|---|---|
| | | | | 3967 | Tisha | L.N. |
| | | 8195 | | | Harrell | L.N. |
| | | | | 5965 | Dustin | L.N. |
| | | — | | 3966 | Tisha | L.N. |
| 8879 | | | — | | Miller | L.N. |
| 8880 | | | | 5967 | Tisha | L.N. |
| 8881 | | | | 5968 | Tisha | L.N. |
| | | | | | Miller | L.N. |
| | | | 1576 | | Carol | L.N. |
| | | | 1577 | | Carol | L.N. |
| | | 8915 | | | Tom | L.N. |
| | | 8916 | | | Tom | L.N. |
| | | | | 5969 | Dramm | L.N. |
| | | | | 5970 | Jo-Ann | L.N. |
| | | | 8196 | | | L.N. |
| | 8907 | | | | Dorothy | L.N. |
| | 8908 | | | | Dorothy | L.N. |
| | 8909 | | | | Dorothy | L.N. |
| | 8910 | 8915 | | | Dorothy | L.N. |

## NOTE TURN-IN TO BANKER AT END OF SHIFT

### ROOM ATTENDENT CHECK LIST:

1. LOOK PROFESSIONAL- CORRECT DRESS CODE- POSTURE IN ROOM
2. ATTITUDE- BE FRIENDLY AND KNOW YOUR PLAYERS BY NAME
3. NEVER LEAVE ROOM; UNLESS RELIEVED
4. OWNERSHIP- TAKE OWNERSHIP IN YOUR ROOM- KEEP IT CLEAN AT ALL TIMES
5. WATCH YOUR PLAYERS AND UNDERSTAND HOW TO PLAY ALL THE MACHINES, BE ABLE TO ASSIST PLAYERS
6. NEVER ANY IDEL TIME- (UNLESS ON BREAK) KEEP CASINO CLEAN
7. NO PERSONAL PHONE CALLS RECEIVED OR MADE
8. CHECK I.D.'S ON ANYONE WHO LOOKS UNDER 25
9. YOU CAN NOT LEAVE THE CASINO DURING WORK HOURS
10. BREAKS WILL BE SCHEDULED BY SHIFT SUPERVISOR (TWO TEN MINUTE PER SHIFT)
11. TWENTY MINUTES FOR MEAL ON EACH SHIFT APPROVED BY SHIFT MANAGER.

A-23

LV
2
11-25-98

CAT

Ticket #0631
$125.00

Nov 25 17:55 1998
Player #1
one hundred
twenty-five dollars

Thank You

I,_____, have not
won more than $125 in the past 24
hours.

**PAID**

---

LV
11-25-98
2

CAT

Ticket #0632
$125.00

Nov 25 17:55 1998
Player #1
one hundred
twenty-five dollars

Thank You

I,_____ have not
won more than $125 in the past 24
hours.

**PAID**

---

LV
11-25-98
2

CAT

Ticket #0629
$125.00

Nov 25 17:44 1998
Player #2
one hundred
twenty-five dollars

Thank You

I,_____, have not
won more than $125 in the past 24
hours.

**PAID**

---

LV
11-25-88
2

CAT

Ticket #0630
$0.50

Nov 25 17:44 1998
Player #2
fifty cents

Thank You

I,_____ have not
won more than $125 in the past 24
hours.

**PAID**

A-24

548

I HEREBY CERTIFY THAT I HAVE NOT RECEIVED A CASH PAYOUT FOF CREDITS EA
EARNED FOR FREE GAMES IN EXCESS OF $126.00 AT THIS LOCATION WITHIN THE
PRECEDING 24-HOUR PERIOD. AND FUNDS I HAVE RECEIVED OVER $125.00 I
HEREBY ACKNOWLEDGE UNDER SOUTH CAROLINA CODE 32-1-20.

LOCATION __CAT__ DATE __11-25-98__

SHIFT __2nd__ ROOM ATTENDENT
 INITIAL

| 1 | 2 | 3 | 4 | 5 | SIGNATURE | |
|---|---|---|---|---|---|---|
| | 613 | | | | R | L.V. |
| | 614 | | | | | L.V. |
| | 615 | | | | | L.V. |
| | 616 | | | | | L.V. |
| | 617 | | | | | L.V. |
| | | | | 618 | | LV |
| | | | | 619 | | LV |
| | | | 620 | | | LV |
| | | | | 621 | | LV |
| | 622 | | | | | LV |
| | 623 | | | | | LV |
| | 624 | | | | R | LV |
| | 625 | | | | | LV |
| | 626 | | | | | LV |
| | 627 | | | | | LV |
| | 628 | | | | | LV |
| | 629 | | | | | LV |
| | 630 | | | | | LV |
| | 631 | | | | | |
| | 632 | | | | | |

## NOTE TURN-IN TO BANKER AT END OF SHIFT

### ROOM ATTENDENT CHECK LIST

1. LOOK PROFESSIONAL- CORRECT DRESS CODE- POSTURE IN ROOM
2. ATTITUDE- BE FRIENDLY AND KNOW YOUR PLAYERS BY NAME
3. NEVER LEAVE ROOM; UNLESS RELIEVED
4. OWNERSHIP- TAKE OWNERSHIP IN YOUR ROOM- KEEP IT CLEAN AT ALL TIMES
5. WATCH YOUR PLAYERS AND UNDERSTAND HOW TO PLAY ALL THE MACHINES, BE ABLE TO ASSIST PLAYERS
6. NEVER ANY IDEL TIME- ( UNLESS ON BREAK) KEEP CASINO CLEAN
7. NO PERSONAL PHONE CALLS RECEIVED OR MADE
8. CHECK I.D.'S ON ANYONE WHO LOOKS UNDER 25
9. YOU CAN NOT LEAVE THE CASINO DURING WORK HOURS
10. BREAKS WILL BE SCHEDULED BY SHIFT SUPERVISOR (TWO TEN MINUTE PER SHIFT)
11. TWENTY MINUTES FOR MEAL ON EACH SHIFT APPROVED BY SHIFT MANAGER.

A - 25

CAT

Ticket #0640
$125.00

Nov 25 18:09 1998
Player #5
one hundred
twenty-five dollars

Thank You

I, _____, have not
won more than $125 in the past 24
hours.

CAT

Ticket #0641
$36.50

Nov 25 18:09 1998
Player #5
thirty-six dollars
fifty cents

Thank You

I, _____, have not
won more than $125 in the past 24
hours.

CAT

Ticket #0638
$125.00

Nov 25 18:09 1998
Player #5
one hundred
twenty-five dollars

Thank You

I, _____, have not
won more than $125 in the past 24
hours. NOV 25 1998

CAT

Ticket #0639
$125.00

Nov 25 18:09 1998
Player #5
one hundred
twenty-five dollars

Thank You

I, _____, have not
won more than $125 in the past 24
hours.

A-26

550

I HEREBY CERTIFY THAT I HAVE NOT RECEIVED A CASH PAYOUT FOF CREDITS EA EARNED FOR FREE GAMES IN EXCESS OF $126.00 AT THIS LOCATION WITHIN THE PRECEDING 24-HOUR PERIOD. AND FUNDS I HAVE RECEIVED OVER $125.00 I HEREBY ACKNOWLEDGE UNDER SOUTH CAROLINA CODE 32-1-20.

LOCATION _Cat_ DATE _11-25-98_

SHIFT _7a_ ROOM ATTENDENT INITIAL.

| 1 | 2 | 3 | 4 | 5 | SIGNATURE | |
|---|---|---|---|---|---|---|
| 633 | | | | | | LV |
| | | 634 | | | | LV |
| | | | | 635 | | LV |
| | | | - | 636 | | LV |
| | | | | 637 | | LV |
| | | | | 638 | | LV |
| | | | | 639 | | LV |
| | | | | 640 | | LV |
| | | | | 644 | | JF |
| | | | 645 | | Lee | LV |
| | | | 646 | | | LV |
| | | | | 647 | | LV |
| | | | 648 | | Lee | LV |
| | | | 649 | | | LV |
| | | | 650 | | | LV |
| | | | 651 | | | LV |
| | 652 | | | | | LV |
| | 653 | | | | | LV |
| | 654 | | | | | LV |
| | 655 | | | | | LV |

## NOTE TURN-IN TO BANKER AT END OF SHIFT

### ROOM ATTENDENT CHECK LIST

1. LOOK PROFESSIONAL- CORRECT DRESS CODE- POSTURE IN ROOM
2. ATTITUDE- BE FRIENDLY AND KNOW YOUR PLAYERS BY NAME
3. NEVER LEAVE ROOM; UNLESS RELIEVED
4. OWNERSHIP TAKE OWNERSHIP IN YOUR ROOM- KEEP IT CLEAN AT ALL TIMES
5. WATCH YOUR PLAYERS AND UNDERSTAND HOW TO PLAY ALL THE MACHINES, BE ABLE TO ASSIST PLAYERS
6. NEVER ANY IDEL TIME- ( UNLESS ON BREAK) KEEP CASINO CLEAN
7. NO PERSONAL PHONE CALLS RECEIVED OR MADE
8. CHECK I.D.'S ON ANYONE WHO LOOKS UNDER 25
9. YOU CAN NOT LEAVE THE CASINO DURING WORK HOURS
10. BREAKS WILL BE SCHEDULED BY SHIFT SUPERVISOR (TWO TEN MINUTE PER SHIFT)
11. TWENTY MINUTES FOR MEAL ON EACH SHIFT APPROVED BY SHIFT MANAGER.

A-27

## Collins Entertainment, Inc.

Collins Entertainment, Inc. acknowledges that this court has ruled that the legal payout limit is $125 regardless of the money deposited. It is at least on notice of the same interpretation by DOR and Administrative Law Judge Allison Lee. It claims to require its lessors to conform

their payout practices to this interpretation of the law. Regardless of this stated requirement, Collins' machines display and print out series of tickets for jackpots in amounts in excess of $125.

Collins claims he is "telling [his] people you pay $125 and no more and that's the law of the land, and we live with the law of the land. We always have." However, he admits not knowing of any manuals or training materials that put into effect this decree.

Records produced during discovery by Collins Entertainment establish that its locations routinely pay out greater than $125 to players within a 24–hour period. Copies of Collins' payout tickets included multiple series of tickets totaling greater than $125 for the same series of play. Some of Collins' tickets state "I have not won more than $125 in the last 24 hours." Some of these tickets are unsigned. Others are signed only with a first name. Collins admits that it determines its profits by means of the voucher tickets. This confirms that Collins is aware that jackpots in excess of $125 are being routinely paid. Some locations leasing Collins' machines use "refund" vouchers which indicate:

> I certify that the refund I am requesting is no greater than the amount of money I have deposited in the machine and this refund is not in excess of $125.00 (value of earned credits) per day per location. I further certify that I have not used the machine as a gambling device.

Of the refund vouchers submitted to this court, it appears that only two of the fourteen blanks are filled in: the attendant's initials and a date. There is, however, no signature on the certification, nor a name, personal information, credits earned, meter number, or other information required by the form itself.

Some of Collins' tickets state "I have not won more than $125 in the last 24 hours." Some of these tickets are unsigned. Others are signed only with a first name.

FReddy's
Ticket # 266
9-15-97
$1,125

OK To PAY
Robert

Freddy's
CK # 267
9-15-97
$1,125

OK To PAY
Robert

PLAINTIFF'S
EXHIBIT
#21 Collins
2/5/99 nos
PENGAD Bayonne, N.J.

A-29 3500

players

REDEMPTION TICKET
Collins Entertainment Corp.
SN#04026609 I00 100 00 V2.79

Black Jack 1 Player 2 $125.00

Ticket: 000158 Computer Number: Devl

Credits 2500
Credit Value X $ 0.05
$ 125.00

X
I have not won more than $125 in the
last 24 hours.

players

REDEMPTION TICKET
Collins Entertainment Corp.
SN#04026609 I00 100 00 V2.79

Black Jack 1 Player 2 $125.00

Ticket: 000157 Computer Number: Devl

Credits 2500
Credit Value X $ 0.05
$ 125.00

X
I have not won more than $125 in the
last 24 hours.

155 125
156 125
157 125
158 125
500

players

REDEMPTION TICKET
Collins Entertainment Corp.
SN#04026609 I00 100 00 V2.79

Black Jack 1 Player 2 $125.00

Ticket: 000155 Computer Number: Devl

Credits 2500
Credit Value X $ 0.05
$ 125.00

X
I have not won more than $125 in the
last 24 hours.

players

REDEMPTION TICKET
Collins Entertainment Corp.
SN#04026609 I00 100 00 V2.79

Black Jack 1 Player 2 $125.00

Ticket: 000156 Computer Number: Devl

Credits 2500
Credit Value X $ 0.05
$ 125.00

X
I have not won more than $125 in the
last 24 hours.

A-30 3510

554

Date _9-11-97_

**VOUCHER**

DRIVER LICENSE #_____

_____ is entitled to _____

FULL NAME _____

play credit games on the _____

Games must be played within five (5) days. _____ machine.

ADDRESS _____

_____

(Signature of Attendant)

_____

62500

In Lieu of playing the above play credit games,
· I request a refund in the amount of $ _CREDIT VALUE = .05_

SOCIAL SECURITY # _____

I certify that the refund I am requesting is no greater than the amount of money
I have deposited in the machine and this refund is not in excess of $125.00 (value of
earned credits) per day per location. I further certify that I have not used the machine
as a gambling device.

SEX M ☐ F ☐ _____ BIRTHDATE

_____

ENDING METER # _____

(Signature of Player)

BEGINNING METER # _____

```
U.S.GAMES,INC. VER:POG_J71B/R371COL1
TERM#000001 BANK#01
JACKPOT VIDEO #6
8854 VALID AT THIS LOCATION ONLY! *****
LICENSE#2805 TERMINAL#536A BR#03 MK#0370

TICKET#00001239 -- CREDIT VALUE = $0.05
*** VOUCHER TICKET ***
*** SHAMROCK 7'S ***

CRED: 2500 $ 125.00
*******ONE HUNDRED TWENTY*******
*****FIVE-DOLLARS AND NO CENTS*****

X

VOID IF MUTILATED VAL# 0892FE6
*** COPYRIGHT 1986-76 U.S.GAMES,INC. ***
```

```
U.S.GAMES,INC. VER:POG_J71B/R371COL1
TERM#000001 BANK#01
JACKPOT VIDEO #6
8854 VALID AT THIS LOCATION ONLY! *****
LICENSE#2805 TERMINAL#536A BR#03 MK#0370

TICKET#00001240 -- CREDIT VALUE = $0.05
*** VOUCHER TICKET ***
*** SHAMROCK 7'S ***

CRED: 2500 $ 125.00
*******ONE HUNDRED TWENTY*******
*****FIVE DOLLARS AND NO CENTS*****

X

VOID IF MUTILATED VAL# 3A845D7
*** COPYRIGHT 1986-76 U.S.GAMES,INC. ***
```

COLLINS GAMING SERVICES

A-31

3502